907 F.2d 372
 134 L.R.R.M. (BNA) 2657, 59 USLW 2051,
116 Lab.Cas. P 10,196
 EMHART INDUSTRIES, HARTFORD DIVISION, Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America, (UAW),
Local 376, Intervenor.
 Nos. 1174, 1285, Dockets 90-4002, 90-4012.
 United States Court of Appeals,
Second Circuit.
 Argued April 18, 1990.
Decided June 29, 1990.
 
 Burton Kainen, Hartford, Conn. (Siegel, O'Connor, Schiff, Zangari & Kainen, P.C., Kenneth R. Plumb, of counsel), for petitioner, cross-respondent.
 Dean Lawrence Burrell, Atty., N.L.R.B., Washington, D.C. (Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervising Atty., N.L.R.B., Washington, D.C., of counsel), for respondent, cross-petitioner.
 Gregg D. Adler, Hartford, Conn. (Gould, Livingston, Adler & Pulda, of counsel), for intervenor.
 Before TIMBERS, PRATT and MINER, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Emhart Industries, Hartford Division ("Emhart"), petitions for review, and the National Labor Relations Board ("NLRB" or "the board") cross-petitions for enforcement, of an order of the board dated November 13, 1989, finding that Emhart committed an unfair labor practice almost six years earlier when, after reaching impasse with the union, it implemented part, but not all, of its earlier proposal for reinstating strikers. Because the board's findings are not supported by substantial evidence on the record as a whole, and because the board's delay in deciding this case would make enforcement of its remedy now senseless, if not impossible, we grant the petition to review and deny enforcement of the board's order.
 
 BACKGROUND
 
 2
 Emhart manufactured "glass forming machinery" and related products at two facilities in Bloomfield and Windsor, Connecticut. Emhart's employees were represented by Local 376 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "union"). When a three-year collective bargaining agreement between the parties expired in September 1982, the union went out on strike.
 
 
 3
 On March 16, 1983, after striking for a little over six months, the union sent a telegram to Emhart unconditionally offering to return to work the next day. Emhart responded by telegram later that afternoon, telling the union that it could not immediately reinstate all of the workers because its facilities were shut down and largely empty due to the length of the strike.
 
 
 4
 At six the next morning, a Thursday, the president of local 376 led a group of about 100 strikers to the gates of the Windsor facility, ready for work. They found the entrance to the plant locked and posted with a notice stating that the company would contact employees individually about their reinstatement. The union president, Phillip Wheeler, then asked a nearby security guard to summon Emhart's vice-president for labor relations, Donald MacKay, outside to discuss the situation. After being called to the gate, MacKay assured Wheeler that the company was not engaging in a lock-out. Instead, MacKay told him, Emhart needed to do some initial "start-up" work before it could begin functioning at full capacity. To perform this start-up work, Emhart would immediately rehire some, but not all, of the strikers. Those not rehired would receive unemployment slips and would be recalled by the company as needed.
 
 
 5
 Later that day, Emhart confirmed its plan for resuming operations in a telegram to the union. According to the telegram, reinstatement of workers would begin on the following Monday. Although the telegram was silent as to which employees would begin work on that date, the union believed that the order of reinstatement would be determined by "plant-wide seniority", a system applicable to layoffs under the old collective bargaining agreement. As the term suggests, reinstatement by "plant-wide seniority" means that employees are rehired in the order of their seniority at the plant, regardless of whether they had performed the particular job for which they were being rehired.
 
 
 6
 As planned, Emhart reinstated approximately 70 start-up workers on Monday, March 21, 1983. However, it determined the order of reinstatement not by plant-wide seniority, as the union had expected, but by seniority "within classification". Under this system, Emhart filled each job vacancy by reinstating the most senior worker who had performed that particular job before the strike, even if he or she held less plant-wide seniority than workers in other departments.
 
 
 7
 The union immediately filed a number of grievances with the company, one of which involved the order of reinstatement. That grievance stated in full: "The company laid off the wrong employee's under the normal an established procedures. Request proper employee's be recall an that they be made whole for all losses." General Counsel's Exhibit 6, Grievance Form of Local 376, UAW, dated March 21, 1983 (spelling in original). The next day, representatives for Emhart and the union met at the offices of the state labor department. Although the parties later disagreed about which subjects were raised at the meeting, the board found that the issue of reinstatement was not among those discussed.
 
 
 8
 During the summer of 1983, the parties exchanged a series of letters expressing a general willingness to negotiate over the method of reinstatement, but also quarreling about whether the subject had in fact been discussed in earlier bargaining sessions. The union said it had, and the company said it had not. Throughout this period, Emhart continued to reinstate employees by seniority within job classification.
 
 
 9
 When the parties met again in October 1983, the union proposed a different method for reinstating strikers. The union's proposal involved two significant changes from the procedure in effect since the end of the strike: (1) the order of reinstatement would be determined by plant-wide seniority rather than by seniority within classification, and (2) union stewards would enjoy "superseniority" status and would return to work immediately--if necessary, replacing, or "bumping", current employees.
 
 
 10
 Emhart rejected the union's proposal, and, on November 4, 1983, countered with a proposal of its own. Emhart's proposal--a four-page document entitled "Special Reinstatement Procedure"--included an introductory section providing that "the Union waives, releases and settles all claims involving the reinstatement procedure utilized by the Company prior to the signing of this agreement", followed by eight numbered paragraphs setting forth the details of a new reinstatement procedure.
 
 
 11
 Numbered paragraph 1 of the company's proposal provided for reinstatement of workers "in the order of their seniority" (i.e., by plant-wide seniority). Paragraph 2 allowed reinstatement "either to [an employee's] original job, the job he held at the onset of the strike," or to a lower job, "in accordance with seniority and ability to meet the requirements of the job." Paragraph 3 described eligibility for higher job classifications through a "job bidding" process. Paragraph 4 provided for a five-day orientation period to allow employees to familiarize themselves with new positions. Paragraph 5 stated that workers rehired to their original jobs would receive the same relative wage rate "within the rate range formerly held". Paragraph 6 set forth the mechanics of the reinstatement process, and paragraph 7 required employees to notify the company of address changes. Finally, paragraph 8 established a bidding process for vacancies not filled under either the plant-wide seniority procedure described in paragraphs 1 and 2, or the "recall" system used under the expired collective bargaining agreement.
 
 
 12
 In its proposal, then, the company yielded to the union's demands insofar as it based the order of reinstatement on plant-wide seniority. But the proposal did not include the second plank of the union's demands--superseniority for union stewards. The union also took issue with the "release clause" that required the union to waive all claims concerning the reinstatement procedure. Because of these differences, the union refused to accept the company's proposal.
 
 
 13
 Through the winter of 1983-84, the parties continued, without success, to reach a compromise. On December 22, 1983, Emhart offered to fill two vacancies at the Bloomfield plant according to plant-wide seniority. The union rejected this offer, however, and Emhart filled the openings according to seniority within classification, as it had with each vacancy since the end of the strike. When another opening arose on February 1, 1984, the company again offered to fill it by plant-wide seniority, but the union once again declined, and this opening, too, was filled by seniority within classification.
 
 
 14
 On February 10, 1984, Emhart informed the union that all future vacancies would be filled according to plant-wide seniority, a system that has remained in effect ever since. No one disputes that Emhart thereby changed the reinstatement procedure without the union's consent, nor does anyone seriously dispute that it did so only after the parties had reached an impasse in negotiations, as both the ALJ and the board specifically found.
 
 
 15
 The union charged that the company's unilateral change in the reinstatement procedure--a mandatory subject of bargaining--constituted an unfair labor practice in violation of Secs. 8(a)(1) and (5) of the National Labor Relations Act. After a hearing on this and two other charges not relevant to this appeal, ALJ Wallace H. Nations rejected the complaint and held that Emhart did not violate the act when it implemented the new reinstatement procedure.
 
 
 16
 According to the ALJ, reinstatement by plant-wide seniority (effectively, paragraphs 1 and 2 of the company's November 1983 proposal), "while not identical with its last offer, adopted substantially the procedure that had been urged by the Union since the ending of the strike", and was "certainly within the spirit of the negotiations". Therefore, the ALJ concluded, Emhart's action fit within the well-established principle that, following impasse, an employer may lawfully make unilateral changes in working conditions that are reasonably comprehended within its pre-impasse proposals to the union.
 
 
 17
 More than three and a half years later, and after the parties had signed two intervening contracts featuring reinstatement by plant-wide seniority, the board reversed the ALJ's decision and held that Emhart's implementation of that procedure in February 1984 was a violation of the act. Although the board's rationale is not entirely clear, it stated that reinstatement by plant-wide seniority "reflected only a relatively small part of the comprehensive system proposed by [Emhart] in November [1983]", and "differed significantly from both [Emhart's] own proposal and its agreement with the Union". For these reasons, the board concluded that the reinstatement procedure was not reasonably comprehended within the company's pre-impasse proposals.
 
 
 18
 As the remedy for this violation, the board ordered Emhart to cease and desist from unilaterally changing the procedure for reinstating strikers at the Bloomfield plant "in a manner substantially different from its pre-impasse bargaining proposals and different from its agreements with the Union", and to make whole or offer reinstatement to strikers who would have been reinstated in the absence of the violation. The board also ordered Emhart to post notices advising employees of their rights under the order "for 60 consecutive days in conspicuous places" at the Bloomfield plant. The order did not mention that the Bloomfield plant had been closed for more than four years.
 
 DISCUSSION
 
 19
 Emhart contends that the board's findings are not supported by substantial evidence on the record as a whole. See 29 U.S.C. Sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It also argues that enforcement should be denied because of the prejudicial effects of the board's delay in deciding this case. We agree with Emhart on both points.
 
 
 20
 A. Unilateral Change in the Reinstatement Procedure.
 
 
 21
 It is settled law that where an employer bargains in good faith to impasse, as Emhart did here, it may implement unilateral changes in working conditions so long as the changes are reasonably comprehended within its pre-impasse proposals to the union. NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Taft Broadcasting Co., 163 N.L.R.B. 475 (1967), enf'd, 395 F.2d 622 (D.C.Cir.1968). The employer need not implement all of its pre-impasse proposals, but the changes must be "in line with or * * * no more favorable than" those offered prior to impasse. Bi-Rite Foods, Inc., 147 N.L.R.B. 59 (1964). In other words, the company's changes must be "consistent with its offers which the union has rejected", 1 C. Morris, The Developing Labor Law 634-35 (1983); NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729, 734 (1st Cir.1964), and must be "within the ambit of proposals already made and rejected." American Fed. of Television & Radio Artists v. NLRB, 395 F.2d 622, 629 (D.C.Cir.1968). See generally R. Gorman, Labor Law 445-46 (1976) (discussing unilateral changes following impasse).
 
 
 22
 Here the board held that the plant-wide seniority system implemented by Emhart was not "reasonably encompassed within its pre-impasse proposals" because the system "reflected only a relatively small part" of the November 1983 proposal. The board also found that the change failed to "include use of the 'recall selection form' agreed on by the parties in December [1983]." Therefore, the board held, the February 1984 change "differed significantly from both [Emhart's] own proposal and its agreement with the union".
 
 
 23
 To begin with, Emhart's formal proposal of November 1983 may not have been its "final pre-impasse proposal" to the union. Although the parties had clearly reached impasse on or before February 10, 1984, neither the ALJ nor the board identified precisely when the impasse occurred. Impasse may have occurred when the union rejected the November 1983 proposal, but it may instead have occurred only after the union rejected Emhart's subsequent offers to use plant-wide seniority for rehires at the Bloomfield plant (i.e., on December 22, 1983, or February 1, 1984). While there is support for both conclusions in the record, the evidence tends to suggest that true impasse did not take place until the later period, particularly since the parties corresponded, met, and, according to the board, agreed to use a "recall selection form", all after the union had rejected the company's formal eight-point proposal. If impasse did not occur until one of these later dates, our decision would be a simple one, because Emhart would have fully implemented its final "pre-impasse proposal" to the union, rather than having implemented only a portion of its November 1983 proposal.
 
 
 24
 We do not need to resolve this question, however, because even assuming that impasse occurred in November 1983, we conclude that the board's finding is not supported by the record. Once an employer bargains in good faith to impasse, its duty to bargain further is suspended, and it is free to impose all--or part--of its pre-impasse proposals, provided its actions were "reasonably comprehended" within its earlier offers to the union. In this case, reinstatement by plant-wide seniority was surely "reasonably comprehended" within Emhart's November 1983 proposal, even if other aspects of that proposal were not also implemented. Indeed, Emhart's reinstatement procedure was an explicit part of the November proposal.
 
 
 25
 This case thus differs significantly from cases in which an employer unlawfully institutes a change that was not included in its pre-impasse proposals, see Peerless Roofing Co. v. NLRB, 641 F.2d 734 (9th Cir.1981), or imposes a wage increase higher or lower than one previously offered. See Katz, 369 U.S. at 745, 82 S.Ct. at 1112; NLRB v. Crompton-Highland Mills, Inc., 337 U.S. 217, 224-25, 69 S.Ct. 960, 963-64, 93 L.Ed. 1320 (1949); Winn-Dixie Stores, Inc. v. NLRB, 567 F.2d 1343, 1349-50 (5th Cir.), modified on other grounds, 575 F.2d 1107 (per curiam), cert. denied, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). Instead, the case bears greater similarity to one in which an employer lawfully implemented the wage portions, but not the benefits portions, of its final pre-impasse offer. "In view of the nature of an impasse," the board held in that case, "there is no requirement that an employer who implements some of his proposals, must implement his entire proposal." Presto Casting Co., 262 N.L.R.B. 346 (1982), enforced in part and denied in part on other grounds, 708 F.2d 495 (9th Cir.), cert. denied, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); see also Financial Institution Employees of America, Local 1182 v. NLRB, 738 F.2d 1038, 1042-43 (9th Cir.1984) (per curiam) (no violation where employer implements "portions" of pre-impasse offer).
 
 
 26
 Based on our review of the record, the board's emphasis on the "recall selection form" is puzzling, if not inexplicable. This form had apparently been used before the strike in recalling laid off workers, and there was some testimony that the parties had agreed to reinstitute its use in December 1983. The board reasoned that because the company may have stopped using the recall form in February 1984, the procedure instituted at that time "differed significantly from * * * [Emhart's December 1983] agreement with the Union". But aside from stating that the recall form allowed "certain employees * * * to designate jobs to which they preferred to be recalled", the board did not explain why the form was significant to the parties, and we cannot independently ascertain its importance from the record. Surely, it is not apparent from the face of the form. The only testimony on this issue appears to be Wheeler's statement that the company agreed to "a couple of proposals" in December 1983, and that he "believe[d]" that the recall selection form was one of these proposals. But there was no testimony that the recall form was ever used after December 1983, or that its use, if any, was discontinued in February 1984. Such slim, ambiguous evidence, without any explanation of its significance, does not constitute "substantial evidence" of an unfair labor practice.
 
 
 27
 Finally, we note that the only legal authorities cited in the board's order lend no support whatsoever to its position. In Tampa Sheet Metal Co., 288 N.L.R.B. No. 43 (1988), an employer unilaterally discontinued payments to a union pension fund after offering to continue such payments. Thus, the case stands for the uncontroversial proposition that an employer may not offer to do one thing before impasse, and then do the opposite once impasse has been reached. The decision certainly does not support the idea advanced by the board here--that an employer may not unilaterally impose only a part of its pre-impasse proposal. The other case cited in the board's order, Sierra Publishing Co., 291 N.L.R.B. No. 84 (1988), involved unilateral action before impasse, and thus provides no meaningful guidance as to what an employer may or may not do after impasse. The board's reliance on the case is peculiar, to say the least.
 
 
 28
 B. Administrative Delay.
 
 
 29
 Although the reasons explained above provide a more-than-adequate basis for our decision, we believe that the board's inexcusable delay in deciding this case--or, more precisely, the effects of that delay on the efficacy and reasonableness of the board's remedy--provide an independent ground for denying enforcement.
 
 
 30
 Remedies in unfair labor practice cases must be designed "to restore the status quo as nearly as possible, had the wrong not been committed". NLRB v. Remington Rand, Inc., 94 F.2d 862, 872 (2d Cir.) (Hand, J.), cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540 (1938). For this reason, prompt resolution of these claims is critical. Without a final determination of the charge, the rights and duties of the parties remain unresolved, injuries not only remain unrecompensed but also continue to be incurred, and neither side can enter into negotiations with any confidence about where it stands as to past wrongs and future liabilities. As then-Chief Judge Lumbard succinctly put it, remedies for unfair labor practices "must be speedy in order to be effective." NLRB v. Mastro Plastics Corp., 354 F.2d 170, 181 (2d Cir.1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966).
 
 
 31
 The importance of promptly resolving unfair labor charges is reflected in a number of NLRB procedures and practices, particularly at the early stages of the administrative process. For example, the limitations period for filing an unfair labor practice charge is a relatively brief six months. NLRA Sec. 10(b). Pre-trial discovery, perhaps the primary source of delay in civil actions, is almost never allowed by the board. 2 C. Morris, supra, at 1625 (citing NLRB Case Handling Manual, Pt. 1, Unfair Labor Practice Proceedings, r10292.4). Moreover, board procedures are designed to encourage voluntary settlement before issuance of the complaint, see 29 C.F.R. Sec. 101.7, and at every subsequent stage of the proceedings. Id. Sec. 101.9 (settlement after formal proceedings have begun).
 
 
 32
 Sadly, however, once a case is presented to the board, "it appears to enter a new dimension--one where time has little meaning." House Committee on Government Operations, Delay, Slowness in Decisionmaking, and the Case Backlog at the National Labor Relations Board, H.R.Rep. No. 1141, 98th Cong., 2d Sess. 16 (1984). The long delays that we have come to expect from the board often force workers to wait years for a decision, a process that can be so frustrating that many have said they "would prefer to have the case decided immediately by the flip of a coin." Id. at 11. Employers are similarly harmed by excessive delay, since a company's liability for any violation ultimately found continuously escalates while the case is pending. And delay is ultimately corrosive to the collective bargaining process itself, as the parties are forced to bargain with one another without knowing what the board might ultimately decide; and, when a decision is finally issued, the remedy often "will bear little relation to the human situation which gave rise to the need for Government intervention." Advisory Panel on Labor-Management Relations Law, Report to the Senate Committee on Labor and Public Welfare, Organization and Procedure of the National Labor Relations Board, S. Doc. No. 81, 86th Cong., 2d Sess. 2 (1960).
 
 
 33
 Although administrative delay before the board is deplorable, a court's responsibility in reviewing long-delayed orders is far from certain. Of course, if the board has not yet issued its decision, an aggrieved party may bring an action seeking to compel the board to act, because the NLRB, like other federal agencies, has a statutory duty to conclude its proceedings "within a reasonable time", 5 U.S.C. Sec. 555(b), and a court may compel agency action "unlawfully withheld or unreasonably delayed". 5 U.S.C. Sec. 706(1); see Silverman v. NLRB, 543 F.2d 428 (2d Cir.1976) (per curiam) (mandamus granted to compel NLRB to determine amount of back pay award); Deering Milliken, Inc. v. Johnston, 295 F.2d 856, 863-64 (4th Cir.1961) ("courts have the right and the duty to enforce the [Administrative Procedure] Act's requirement that the Board proceed with reasonable expedition").
 
 
 34
 But where the case reaches us after the board has issued a decision, the situation is different, and courts have been reluctant to deny enforcement on the basis of administrative delay alone. Although at least one judge of this circuit would hold that "where the lapse of time is chargeable to the snail-like pace of the Board there must be some point at which the courts have the power and the duty to withhold a grant of enforcement", NLRB v. Staub Cleaners, Inc., 418 F.2d 1086, 1091 (2d Cir.1969) (Lumbard, C.J., dissenting), cert. denied, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970), the majority view seems to have been that denying enforcement on the ground of delay alone unfairly "punishes employees for the Board's nonfeasance". NLRB v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local 480, 466 U.S. 720, 725, 104 S.Ct. 2081, 2084, 80 L.Ed.2d 715 (1984) (per curiam); see also NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 266, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969); NLRB v. Star Color Plate Serv., 843 F.2d 1507, 1510 (2d Cir.), cert. denied, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988).
 
 
 35
 Nonetheless, the courts of appeals have been charged by congress with "responsibility for the reasonableness and fairness of Labor Board decisions", Universal Camera, 340 U.S. at 490, 71 S.Ct. at 466, and if we were simply to ignore the effects of administrative delay, we would abandon this important supervisory responsibility. Therefore, while NLRB orders are normally "subject to limited judicial review", Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964), we must withhold enforcement of orders that will not effectuate any reasonable policy of the act, even where the problems with the order are caused primarily by the lapse of time between the practices complained of and the remedy granted. Cf. NLRB v. Koenig Iron Works, Inc., 856 F.2d 1, 3-4 (2d Cir.1988) (denying enforcement of bargaining order where twelve years expired between expiration of collective bargaining agreement and order); NLRB v. J. Coty Messenger Serv., 763 F.2d 92, 99-101 (2d Cir.1985) (denying enforcement of bargaining order where board failed to analyze effect of passage of time and employee turnover).
 
 
 36
 In this case, we believe that the passage of time between the company's action and the board's remedy has so changed the underlying situation at Emhart that enforcement of the order now not only would undermine more labor policies that it would advance, but also would mock reality. In the years that passed between the ALJ's decision and the board's order, the parties signed two collective bargaining agreements, both of which featured reinstatement by plant-wide seniority, the very procedure the board found to be objectionable when implemented unilaterally by Emhart nearly six years earlier. During that six-year period all reinstatements were made on the plant-wide basis, and during most of that period it was done with the union's agreement. Moreover, the board's cease and desist order applies by its own terms only to the Bloomfield plant, see Board's Order at 11, which closed in 1985. The order also directs Emhart to post the standard notices "in conspicuous places" in the now vacant facility. Thus, if we were to accept the board's order for what it actually says, it would be impossible to enforce, because cease and desist orders are "generally confined to the particular geographic location involved." 2 C. Morris, supra, at 1655. In these circumstances, therefore, we would deny enforcement of the board's order even if Emhart had committed an unfair labor practice.
 
 CONCLUSION
 
 37
 For all of the above reasons, the petition to review is granted and enforcement of the board's order is denied.