926 F.2d 181
 136 L.R.R.M. (BNA) 2601, 59 USLW 2575,
118 Lab.Cas. P 10,574
 OLIVETTI OFFICE U.S.A., INC., Olivetti Supplies Inc.,
Petitioners-Cross-Respondents (90-4068),
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner (90-4094),
UAW Local 376, Intervenor (90-4068).
UAW LOCAL 376, Petitioner (90-4082),
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Olivetti Office U.S.A., Inc., Olivetti Supplies, Inc., Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner (90-4082),
v.
ROYTYPE DIVISION, TRIUMPH-ADLER ROYAL INC. and its
Successors, Olivetti Office U.S.A., Inc., and
Olivetti Supplies, Inc., Respondents.
 Nos. 659 to 661, Dockets 90-4068, 90-4082 and 90-4094.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 26, 1990.
Decided Feb. 14, 1991.
 
 Brian Clemow (Shipman & Goodwin, Hartford, Conn., Richard A. Mills Jr. and Kimberly Dean Coran, of counsel), for Olivetti Office U.S.A., Inc., Olivetti Supplies, Inc.
 Susan Price-Livingston (Gould, Livingston, Adler & Pulda, Hartford, Conn., Daniel E. Livingston, Gregg D. Adler, of counsel), for UAW Local 376.
 John H. Fawley (Howard E. Perlstein, Supervisory Atty., Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., of counsel), for N.L.R.B.
 Before OAKES, Chief Judge, CARDAMONE and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 These cross-petitions for review and enforcement of an order of the National Labor Relations Board ("the Board") present two significant issues, one of which we find troubling. First, we must determine whether the Board properly held that Roytype Division, Triumph-Adler Royal, Inc. ("the Company"), predecessor in interest of petitioner Olivetti Office U.S.A., Inc., committed an unfair labor practice by failing to bargain with International Union, United Automobile, Aerospace and Agriculture Implement Workers of America, Local 376 ("the Union") on a mandatory subject of bargaining. Since we answer the question in the affirmative, we must then consider whether the Board-ordered remedy is appropriate.
 
 BACKGROUND
 
 2
 On March 23, 1983, the Company--then located in Newington, Connecticut--and the Union executed a two-year collective bargaining agreement. By November, 1983, the Company found itself in financial straits. The Company's new president, James Snider, met with representatives of the Union to report that the Company had lost $6.6 million in 1982, $5 million in 1983, and he projected a loss of $1.9 million for 1984. Snider told the Union of certain cost-cutting measures he had already implemented. He also indicated that a financial study commissioned by the Company had revealed that the Company's labor costs were too high. Snider then warned the Union that certain wage increases contained in the collective bargaining agreement might have to be renegotiated and that some bargaining-unit work might also have to be subcontracted or relocated.
 
 
 3
 Not surprisingly, this news caused a stir within the Union and soon after the meeting the Union's president, Philip Wheeler, asked the Company to furnish financial data to substantiate the Company's claims of financial hardship. Wheeler assured the Company that all information disclosed would remain confidential. The Union's shop steward also passed along a rumor to the Union's officers that some of the bargaining-unit work had already been subcontracted, and, based on this information, the Union requested the Company to provide any data that would tend to verify or discount this claim. The Company furnished some of the requested financial data, but the Union's financial analyst, Gerald Lazarowitz, found the information inadequate, as it consisted primarily of summaries of the underlying documents. Lazarowitz pressed for the basic documents, including the financial study commissioned by the Company, but the Company claimed that it was unable to provide this information for reasons of confidentiality. The Company also failed to provide any information regarding the alleged subcontracting.
 
 
 4
 In February, 1984, Snider again met with the Union's representatives and outlined a three-point plan that would result in subcontracting some of the production work to a low-cost labor region in Texas or Mexico. The plan also envisioned the relocation of the remainder of the bargaining-unit work to a plant in Georgia. Snider stated that these steps would save the Company $2.6 million, $2 million of which would be directly attributable to reduced labor costs.
 
 
 5
 After the Company unfurled this bold plan, the Union stepped up its efforts to obtain the financial data it had been seeking. The Union particularly wished to examine the Company's self-commissioned financial study and the raw financial data upon which the study was based. While the Company refused, once again, to release a copy of the financial study to the Union, it did allow Lazarowitz to visit the Company's plant to review the study.
 
 
 6
 At the plant, Lazarowitz was informed that he could review the financial study but that he would not be allowed to take a copy of it with him. The Company also refused Lazarowitz's renewed request to examine the underlying financial data upon which the study was based, ostensibly for reasons of confidentiality.
 
 
 7
 The record indicates that the parties met again on March 7, 1984, and the Union expressed its continued dissatisfaction with the Company's refusal to provide the raw financial data. At this meeting--in response to a blunt inquiry by Wheeler--the Company indicated that if the Union were willing and able to make $1.8 million in concessions, the Company would continue its operations in Connecticut. Again, the Union requested access to the Company's financial records; again the request was denied.
 
 
 8
 During the next month, the Union and the Company communicated several times. Proposals and counter-proposals were made. The final proposal by the Company provided for the following: the Union would agree to forego a scheduled five percent pay increase; the Company would implement Part A of its three-point plan, allowing it to subcontract a portion of its production to Mexico; and the Union would pick a consultant who would make a binding determination as to whether costs could be sufficiently cut to avoid the implementation of Parts B & C of the three-point plan, which called for relocation of the remainder of the Company's operations. The Union responded to this proposal, again requesting all relevant financial data. The Company refused to provide the requested information, and, on March 29, 1984, the Union rejected the final proposal.
 
 
 9
 In April 1984, the Company made its final decision to implement the three-point subcontracting and relocation plan. Lay-offs of union employees began in November, 1984. Machinery and operations were transferred to Georgia in early 1985. The last of the employees in Connecticut were laid off by July 1986, and the Connecticut plant was shut down in March 1987. The relocation cost the Company more than $4 million.
 
 
 10
 "Action" By The Board
 
 
 11
 The Union filed an unfair labor practice charge in April 1984, charging the Company with failure to bargain collectively over a mandatory subject of bargaining, in violation of Sections 8(a)(1), (5), and 8(d) of the National Labor Relations Act ("the Act"). 29 U.S.C. Sec. 158(a)(1), (5), and Sec. 158(d) (1988). An Administrative Law Judge ("ALJ") held a hearing from January 28, 1985 through February 1, 1985. On August 20, 1985, the ALJ issued a decision that the Company had committed unfair labor practices in violation of Sections 8(a)(1) & (5) by failing to provide the requisite information to the Union.[1] As a remedy, the ALJ ordered back pay for all employees from the date of lay-off through March 23, 1985, the expiration date of the collective bargaining agreement.
 
 
 12
 Objections to the ALJ's ruling were filed by the parties, and, on June 30, 1987 (almost two years later), the Board issued a decision, agreeing that the Company had committed an unfair labor practice in violation of Sections 8(a)(1) & (5) of the Act. It disagreed, however, with the ALJ's remedy because that remedy was based on the erroneous assumption that the Company had terminated all operations at its Connecticut plant prior to the ALJ's decision. The Board, therefore, vacated the remedy and remanded the matter to the ALJ for further proceedings.
 
 
 13
 On remand, the ALJ held a hearing from November 3, 1987 through November 5, 1987. The ALJ issued a decision on March 31, 1989, more than fifteen months later, that it would be unduly burdensome to require the Company to move its operations back to Connecticut. As a remedy, the ALJ ordered the Company to fulfill its obligation to bargain with the Union over the decision to relocate and subcontract unit work. Additionally, he directed the Company to pay all bargaining unit employees back pay until the bargaining obligation was fulfilled.
 
 
 14
 On May 22, 1990, over thirteen months later, the Board issued a supplemental decision. The Board agreed that the Company should not be required to return its operations to Connecticut, but it again disagreed with the remedy ordered by the ALJ. The Board ordered reinstatement of all bargaining unit employees and payment of any travel and moving expenses. Additionally, the Board ordered the Company to pay all bargaining unit employees back pay from the date of termination to the date of reinstatement, or, for those employees who decided not to relocate, to the date they obtained "substantially equivalent employment" elsewhere. Finally, with respect to employees who had been working in the wide film and fabric operation--a discrete operation sold by the Company in May 1986--the Board ordered back pay through the date of sale.
 
 
 15
 The present series of cross-petitions to this Court began with the Company's petition to review the Board's order. The Company argues that it did not commit any unfair labor practices, but that even if it did, the Board's remedy is improper because it fails to effectuate any legitimate remedial purpose of the Act. The Union, on the other hand, petitioned for review claiming that the Board's remedy is insufficient to restore the status quo ante and that the Board should have ordered the Company to move all its operations back to Connecticut. The Board, of course, petitioned for enforcement of its order.
 
 DISCUSSION
 The Duty to Bargain
 
 16
 We turn first to the question whether the Company's decision to subcontract and relocate was a mandatory subject of bargaining.
 
 
 17
 Section 8(d) of the Act requires employers to bargain in good faith with unions "with respect to wages, hours, and other terms and conditions of employment...." 29 U.S.C. Sec. 158(d). Congress has delegated authority to the Board to decide whether a specific grievance is a mandatory subject of bargaining, and because of the Board's expertise in labor-management relations, its determination will be upheld if it is a "reasonably defensible" interpretation of the Act. Ford Motor Co. v. NLRB, 441 U.S. 488, 495-97, 99 S.Ct. 1842, 1848-49, 60 L.Ed.2d 420 (1979).
 
 
 18
 Decisions affecting the profitability of a company are mandatory subjects of bargaining "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of business." First National Maintenance Corp. v. NLRB, 452 U.S. 666, 679, 101 S.Ct. 2573, 2581, 69 L.Ed.2d 318 (1981). If the underlying problem is not "amenable to resolution through the bargaining process," mandatory collective bargaining would only hamper an employer's ability to conduct his business as he sees fit. See id. at 678, 101 S.Ct. at 2580. Conversely, where a particular grievance may be resolved through collective bargaining, then negotiations would promote the goal of the collective-bargaining process--that is, the promotion of industrial peace. A tension is therefore evident between the protection that the Act was intended to afford organized labor and the latitude that employers must be given to conduct their business; and a sensitive balancing must be performed to determine whether a particular grievance is a mandatory subject of bargaining.
 
 
 19
 When an employer takes action that is economically motivated but results in no change in basic business operations, that action is subject to mandatory bargaining. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 213, 85 S.Ct. 398, 404, 13 L.Ed.2d 233 (1964). This occurs where an employer simply transfers union work to other non-union workers, but continues its same operations. Such a work transfer based on labor costs is the type of grievance particularly suited to resolution through the collective bargaining process. See id. at 213-14, 85 S.Ct. at 404; see also First National Maintenance, 452 U.S. at 680, 101 S.Ct. at 2581 (decisions by an employer motivated by "a desire to reduce labor costs" are amenable to resolution through collective bargaining).
 
 
 20
 The Company's decision in the present case to subcontract and relocate was obviously motivated by "a desire to reduce labor costs." When the Company unveiled its work-transfer plan in February 1984, it stated that the plan would reduce manufacturing costs by $2.6 million, $2 million of which would be directly attributable to cheaper labor. Additionally, the Company informed the Union that if the Union could reduce labor costs by $1.8 million, the Company would not implement its relocation/subcontracting plan. Obviously, labor costs were the driving force behind the Company's action, and the problem was particularly suited to resolution through collective bargaining.
 
 
 21
 Balancing this benefit to the collective bargaining process against a possible burden on the conduct of the Company's business, it is clear that the Company's course of conduct would not have been unduly hampered by bargaining. The Company planned to continue its same manufacturing operations and, by its own admission, would have been willing to forego the work transfer and remain in Connecticut if the Union made certain concessions. The Company has failed to demonstrate any economic exigencies that might justify an employer's need for speed and flexibility in making business decisions. First National Maintenance, 452 U.S. at 682-83, 101 S.Ct. at 2582-83. Thus, in the present situation, mandatory bargaining would benefit the collective bargaining process and that benefit clearly would outweigh any burden on the Company's course of business.
 
 
 22
 The Company argues that the futility of bargaining was apparent from the Union's position, and, therefore, bargaining should be excused. The argument misses the point. One party cannot side-step mandatory bargaining simply by declaring that negotiations would be fruitless. Collective bargaining is mandated for the purpose of attempting to resolve even the most difficult disputes. See H.K. Porter Co. v. NLRB, 397 U.S. 99, 103, 90 S.Ct. 821, 823, 25 L.Ed.2d 146 (1970) ("[t]he basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement"). Experience teaches that the initial belief of one party in the inflexibility of the other is often dispelled by subsequent concessions. To excuse mandatory bargaining because one party thinks it would be futile would tear the fabric of the entire collective bargaining process.
 
 
 23
 We hold, therefore, that the Board's determination that the present grievance is a mandatory subject of bargaining is a reasonably defensible interpretation of the statute.[2]
 
 Waiver
 
 24
 We turn next to the Company's contention that the Union waived its right to bargain over the decision to relocate and subcontract. Specifically, the Company claims that the language of Article II, Section 2 of the collective bargaining agreement--the "Management Rights" clause--amounts to an unequivocal waiver of the Union's statutory right to bargain over work-transfer decisions such as the present one. The "Management Rights" clause provides:
 
 
 25
 The Company will not transfer work customarily performed by members of the bargaining unit to another Company facility, or contract or subcontract out such work, except on the basis of unavailability of trained personnel or necessary equipment, production requirements, or cost of manufacture or distribution. If such decision is based on the cost of manufacture or distribution, the Company will notify and discuss with the Union as soon as possible the reasons why it believes such action to be necessary, so that the parties may explore alternatives to such transfer of work.
 
 
 26
 At the outset, we note that national labor policy disfavors waivers of statutorily protected rights. NLRB v. United Technologies Corp., 884 F.2d 1569, 1575 (2d Cir.1989); Chesapeake & Potomac Telephone Co. v. NLRB, 687 F.2d 633, 636 (2d Cir.1982). As such, only a "clear and unmistakable" waiver will be recognized by the courts. Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); United Technologies Corp., 884 F.2d at 1575. Such a waiver may be express or implied, see Metropolitan Edison, 460 U.S. at 708 n. 12, 103 S.Ct. at 1477 n. 12, and the parties' bargaining history may furnish evidence of an implied waiver. See United Technologies Corp., 884 F.2d at 1575. The burden of proving a union waiver rests with the employer, and, due to the Board's expertise in these matters, its determination will be upheld if supported by substantial evidence. See id.
 
 
 27
 We do not believe that the contractual language in question indicates a clear waiver by the Union, and the Company certainly has not proven that a waiver was intended. As we read the language of Article II, Section 2, the Union intended to preserve its right to bargain, or--at the very least--did not intend to waive it.
 
 
 28
 The last sentence of Section 2 states that if a decision to subcontract or relocate "is based on the cost of manufacture or distribution, the Company will notify and discuss with the Union as soon as possible the reasons why it believes such action to be necessary, so that the parties may explore alternatives to such transfer of work." (emphasis added). We agree with the Board that the duty of the Company to "notify and discuss" is linked to the exploration of alternatives to work transfers. It seems clear to us that Section 2 was intended to deal with the decision to relocate or subcontract not the effects of such a decision. This conclusion is reinforced when it is noted that the parties provided for the effects of a work transfer in Article II, Sections 3 and 4 of the collective bargaining agreement.
 
 
 29
 The question boils down to whether the phrase "notify and discuss" was intended to be synonymous with "negotiate" or "bargain". The Company vigorously asserts that the terms "negotiate" and "discuss" were clearly distinguished during the bargaining process. This, however, is not borne out by the evidence. Indeed, the evidence tends to show that these words were used interchangeably during negotiations. Also, we are not moved by the Company's attempt to distinguish these two terms by resort to the dictionary. "Discussions" are the nucleus of bargaining, and the Company has provided no evidence to convince us that the parties did not intend the contractually mandated "discussions" to amount to collective bargaining.
 
 
 30
 In a slight permutation of the same argument, the Company contends that the second sentence of the Management Rights clause requires only good-faith discussions with the Union. The Company claims that to read the last sentence as requiring full-blown negotiations effectively eliminates the latitude that the first sentence of Article II, Section 2 affords the Company in making work-transfer decisions based on the cost of manufacture or distribution. We disagree.
 
 
 31
 The first sentence of the Management Rights clause clearly can be read to prohibit all work transfers except those falling into certain designated categories. Reading it as such, the agreement gives the Company unfettered discretion to transfer work because of a lack of trained personnel, lack of necessary equipment or production requirements, regardless of any possible statutorily imposed duty to bargain. Additionally, the agreement authorizes the Company to transfer work because of the "cost of manufacture or distribution," but in this situation the Company must comply with the obligation set forth in the second sentence of Section 2, i.e., the obligation to bargain.[3]
 
 
 32
 We conclude, therefore, that the Company has not met its burden of establishing that the Union intended a blanket waiver of its statutorily guaranteed rights.
 
 Failure to Bargain In Good Faith
 
 33
 The next question is whether the Company fulfilled its obligation to bargain to a genuine impasse.
 
 
 34
 An employer is not released from its obligation to bargain to a genuine impasse if "the employer has failed to bargain in good faith." New York Printing Pressmen & Offset Workers Union No. 51 v. NLRB, 538 F.2d 496, 501 (2d Cir.1976). When an employer claims he cannot meet union labor costs, the Supreme Court has said that "a refusal to attempt to substantiate a claim of inability to pay ... may support a finding of a failure to bargain in good faith." NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956).
 
 
 35
 An employer's obligation to provide information to a union extends to "all information necessary for the proper performance of its duties as the exclusive bargaining representative." NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp., 789 F.2d 121, 130 (2d Cir.1986). Such information may be relevant to a union's negotiation of a successor contract or "to the supervision of an existing agreement." Id.
 
 
 36
 It is clear here that the information requested by the Union was relevant to its obligation to enforce the existing agreement. Without the necessary data, the Union had no way to substantiate the Company's claims that it could no longer afford to do business in Connecticut. When dealing with such an integral aspect of labor-management relations, a union should not be required to accept a bald claim of economic hardship at face value. As the Supreme Court has stated: "If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." Truitt Manufacturing, 351 U.S. at 152-53, 76 S.Ct. at 755-56.
 
 
 37
 The Company's claim that the demands of confidentiality prevented it from disclosing the requested information is not persuasive. True it is that an employer may sometimes refuse access to relevant information for reasons of confidentiality. See e.g., Detroit Edison Co. v. NLRB, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). Before recognizing such a right, however, the court must first determine that the union's right to relevant information is outweighed by the employer's legitimate claim to confidentiality. Id. at 314-15, 99 S.Ct. at 1130-31. The burden is on the employer to establish by more than conclusory assertions that relevant information should not be revealed to the union. See Pratt & Whitney Aircraft Div., 789 F.2d at 130-31.
 
 
 38
 In this case, the Union assured the company that all financial data would remain confidential. There was no evidence of past disclosures of confidential information by the Union; and the Company proffered nothing more than its own surmise to demonstrate that some of its financial data might be divulged to outside sources.
 
 
 39
 We therefore agree with the Board that the Company's refusal to provide the financial records requested by the Union constituted a failure to bargain in good faith.
 
 The Remedy
 
 40
 Finally, we must review the reasonableness of the Board-ordered remedy. Approaching this issue, we cannot turn a blind eye to the extensive administrative delay by the Board, and we believe that enforcement of the Board's remedy more than six years after the misconduct would truly "mock reality". Emhart Industries, Hartford Division v. NLRB, 907 F.2d 372, 380 (2d Cir.1990).
 
 
 41
 Appropriate deference to the expertise of the Board in labor disputes implies that a remedy ordered by the Board is subject to limited judicial review. The Board's remedy will not be overturned " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " Fibreboard Paper Products, 379 U.S. at 216, 85 S.Ct. at 406 (quoting Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)). Notwithstanding this limited scope of review, courts are authorized to refuse to enforce Board-ordered remedies when enforcement would be "unnecessary or futile." NLRB v. W.A.D. Rentals Ltd., 919 F.2d 839, 841 (2d Cir.1990); see Emhart Industries, 907 F.2d at 379 (court "must withhold enforcement of orders that will not effectuate any reasonable policy of the [A]ct even where the problems with the order are caused primarily by the lapse of time between the practices complained of and the remedy granted").
 
 
 42
 The remedy in an unfair labor practice case is often an order restoring the status quo ante. Elementary considerations of fairness, therefore, require that the remedy be implemented as soon after the transgression as possible. Emhart Industries, 907 F.2d at 378; see NLRB v. Mastro Plastics Corp., 354 F.2d 170, 181 (2d Cir.1965) (unfair labor practice remedy "must be speedy in order to be effective"), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). Protracted delay necessarily magnifies the injury to displaced workers. It also increases the likelihood that the remedy imposed on the employer will become draconian. See Carpenter Sprinkler Corp. v. NLRB, 605 F.2d 60, 67 (2d Cir.1979) (court should not enforce Board orders that are "penal or confiscatory, rather than remedial"). In such situations, enforcement of the remedial action taken by the Board furthers no purpose of the Act. See Emhart Industries, 907 F.2d at 378-80.
 
 
 43
 We see no legitimate purpose to be served by the enforcement of the Board's remedy in this case. The Board's action punishes the Company for its decision to subcontract and relocate. But the wrong committed by the Company lay, not in its decision but in how it arrived at its decision, i.e., it reached the decision to subcontract and relocate without first bargaining. Thus, the appropriate remedy must be tailored to that wrong. See Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984) (the Act requires that "a proposed remedy be tailored to the unfair labor practice it is intended to redress").
 
 
 44
 In essence, the Board's order compensates union workers for the effects of the work transfer rather than for the unlawful decision to transfer work without bargaining. Such a remedy is improper here, however, because the affected bargaining-unit workers have already been compensated for the effects of the work-transfer decision by a contractual obligation entered into between the Company and the Union in conjunction with the successor collective bargaining agreement. At this juncture it would be draconian to force the Company--which has experienced a drastic change in its operations and personnel requirements--to comply with the Board's remedy. While we recognize that deterrence is a valid objective of Board-ordered remedies, an order, such as the present one, that becomes "penal or confiscatory" because of the Board's delay goes beyond any legitimate remedial purpose of the Act.
 
 
 45
 We might be expected to remand this case to the Board for further proceedings to impose a proper remedy. In light of the history of this case, however, we do not wish to return the parties to what has been aptly described as " 'a new dimension--one where time has little meaning.' " Emhart Industries, 907 F.2d at 378 (quoting House Committee on Government Operations, Delay, Slowness in Decision Making, and the Case Backlog at the National Labor Relations Board, H.R.Rep. No. 1141, 98th Cong., 2d Section 16 (1984)). It would be a grave injustice to prolong this matter. We therefore exercise our authority under Section 10(e) of the Act to modify the Board's remedy.[4] 29 U.S.C. Sec. 160(e).
 
 
 46
 As previously stated, the wrong committed here was the refusal to bargain in good faith. The Board's back pay order requires that the Company pay bargaining unit workers back pay for the past six-plus years, and until that point in the future that they are either reinstated or obtain "substantially equivalent employment." This order is unreasonable because it assumes that, had the parties negotiated, those negotiations would have continued for six years, and possibly into the future. See Sure-Tan, 467 U.S. at 900, 104 S.Ct. at 2813 ("remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences") (emphasis in original); cf. Carpenter Sprinkler, 605 F.2d at 69 (Board's order not enforced where certain assumptions by the Board regarding the equity of its remedy were incorrect). We agree with the Company that the remedy should be limited to back pay for a reasonable period of time in which the parties should have bargained over the work transfer decision.
 
 
 47
 The circumstances of the present case indicate that, had the parties bargained over this, the process would have continued, at the longest, to the point when a new collective bargaining agreement was negotiated. At that point, any negotiations pertaining to the work-transfer decision would have merged into the negotiations for the new contact. As of March 23, 1985, the parties had a new contract which contained an agreement regarding the effects of the work-transfer decision. Therefore, any back-pay remedy that compensates employees beyond the date of the new contract would serve only to penalize the Company without promoting any legitimate purpose of the Act. Thus, back pay for all affected bargaining unit employees should end as of March 23, 1985.
 
 
 48
 Finally, reinstatement of all bargaining unit employees is also an unjust remedy here. In the years intervening between the Company's unfair labor practice and the Board's final remedy, the internal structure of the Company has changed to such a degree as to make reinstatement not only unreasonable but unrealistic. See Fibreboard, 379 U.S. at 216 & n. 10, 85 S.Ct. at 406 & n. 10 (unduly burdensome remedial order should not be enforced).
 
 CONCLUSION
 
 49
 While we affirm the Board's determination that the Company committed an unfair labor practice, we reject the remedy imposed. The Board-ordered remedy not only fails to address the wrong to be remedied, but the Board's unreasonable and unexplained delay in reaching its decision results in a remedy that does not further any purpose of the Act.
 
 
 50
 Enforcement granted as modified.
 
 
 
 [1]
 The ALJ also found that the Company had violated section 8(a)(3) of the Act by discriminating against its employees because of their status as union members. The Board reversed this determination because it had not been litigated. This aspect of the Board's ruling has not been contested
 
 
 [2]
 The Company's argument that the Board's decision should not be enforced because the Board failed to indicate which standard from Otis Elevator, 269 N.L.R.B. 891 (1984), it was relying upon is without merit. The Board reasoned that the claims were mandatory subjects of bargaining under any of the Otis Elevator standards. We agree
 
 
 [3]
 We do not suggest, as did the ALJ, that the Company was required by this contractual provision to obtain the consent of the Union prior to embarking on its work-transfer plan
 
 
 [4]
 We agree with the Board's decision not to order the Company to return its operations to Connecticut as such an order would be unduly burdensome. See, Fibreboard, 379 U.S. at 216, & n. 10, 85 S.Ct. at 406, & n. 10