**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PLAINVILLE READY MIX CONCRETE COMPANY, Respondent.**

No. 93–5337.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1994.

Decided Jan. 26, 1995.

---

**1322**

Randy Frye, Director, N.L.R.B., Cincinnati, OH, Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Frederick C. Havard (briefed), Lisa Richardson Shearin (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for petitioner.

James K.L. Lawrence (argued and briefed), Raymond D. Neusch, Frost & Jacobs, Cincinnati, OH, for respondent.

Before CONTIE, MILBURN, and BATCHELDER, Circuit Judges.

CONTIE, J., delivered the opinion of the court, in which MILBURN, J., joined. BATCHELDER, J. (pp. 1340–1345), delivered a separate dissenting opinion.

CONTIE, Circuit Judge.

Petitioner, the National Labor Relations Board ("NLRB" or "the Board"), petitions for enforcement of an order of the Board finding respondent, Plainville Ready Mix Concrete Co. ("Plainville" or "the Company"), in violation of § 8(a) of the National Labor Relations Act ("NLRA" or "the Act"). For the following reasons, the petition for enforcement of the Board's order is granted.

### I.

On April 5, 1990, the Regional Director for Region 9 of the NLRB issued a consolidated complaint, subsequently amended, alleging that following a lawful impasse in bargaining, respondent Plainville Ready Mix Concrete Co. violated sections 8(a)(1) and (5) of the NLRA[1] by unlawfully implementing certain mandatory subjects of bargaining, which were changes in terms and conditions of employment not encompassed in the Company's prior offers during negotiations with the Truckdrivers, Chauffeurs, and Helpers Local Union No. 100, affiliated with the International Brotherhood of Teamsters, AFL–CIO ("the Union") and were implemented without having afforded the Union an opportunity to bargain on the changes.

On March 5, 1992, a hearing on the consolidated complaint was conducted before an administrative law judge ("the ALJ"). On June 30, 1992, the ALJ issued a decision in which he concluded that on May 1, 1989, the Company violated section 8(a)(5) of the Act by implementing provisions of a wage proposal and a health plan that were inconsistent with its pre-impasse proposals to the Union, which the Union had rejected in negotiations. The ALJ additionally recom-

---

**1.** Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees, subject to the provisions of sec- tion 159(a) of this title." There are no longer alleged independent violations of section 8(a)(1) of the Act in this case. See Joint Appendix, p. 14.

mended that certain Plainville employees be made whole for any losses they had sustained by virtue of the Company's unlawful implementation of the wage and health plans. On November 27, 1992, the NLRB issued its decision and order in which it affirmed the ALJ's rulings and adopted his recommended order. The NLRB petitioned for enforcement of its decision and order on March 15, 1993, and respondent Plainville filed its answer on March 30, 1993.

The Company manufactures, distributes, and sells ready mix concrete. The Union, which has had a bargaining relationship with the Company since the 1960s, represents approximately forty employees in a unit consisting of ready mix drivers, yard employees, and mechanics at the Company's facilities in Batavia, Ohio, and Wilder, Kentucky. The last collective bargaining agreement ("CBA") between the parties prior to the hearing before the ALJ was effective from July 1, 1985 through January 31, 1988. Prior to the expiration of this agreement on January 31, 1988, the parties met on January 12, 19, 22, and 25, 1988 to negotiate a new agreement. During these negotiation sessions, the Company indicated its desire to decrease unit employees' fixed hourly wage rate, allegedly in order to compete successfully in the market. Under the then-existing collective bargaining agreement, drivers with two or more years of service were paid $10.27 per hour.

At the January 22nd bargaining session, in its first economic proposal, the Company proposed to reduce the fixed hourly wage rate of drivers with two or more years of service from $10.27 per hour to $9.00 per hour in the first year of a new three-year contract, in conjunction with implementing gain sharing[2]

and incentive pay plans,[3] which were offered along with the proposed reduction in the fixed hourly wage rate as a way for employees to recoup the loss in wages due to this reduction.[4] The proposed gain sharing and incentive pay plans were not terms of the existing collective bargaining agreement and were presented as an amendment to it. The proposed reduction in the fixed hourly wage rate was offered in conjunction with the gain sharing and incentive pay plans as a "total package deal" for the remuneration of unit employees. The Company advised the Union that although the wage proposal reduced the fixed hourly wage rate, the total wage package could equal or exceed employees' current earnings because of the supplemental wages earned through gain sharing and incentive pay. James Lawrence, the Company's chief negotiator, using a blackboard with figures, explained that employees earning $10.27 per hour under the current fixed hourly wage rate might be able to earn as much as $10.67 or $10.70 per hour under the new wage plan, because in addition to the proposed fixed hourly rate of $9.00 per hour, a supplemental amount would be earned under the new gain sharing and incentive pay plans, which would constitute an additional variable rate per hour depending on how much an employee earned under these plans. The Union objected to the Company's proposal, stating that it wanted a higher fixed hourly rate than the proposed $9.00 per hour instead of the gain sharing and incentive pay plans in case a recession caused building activity to slacken, which would result in employees working for no more than the reduced rate of $9.00 per hour, which was a $1.27 per hour reduc-

2. Gain sharing was a unit-wide bonus system designed to reward eligible employees for improved performance which exceeded established standards. The fund out of which gain sharing dividends would be paid flowed from the Company's determination of the net savings and losses from operations concerning (a) liability insurance, (b) fleet maintenance, (c) plant maintenance, and (d) driver efficiency. Any net savings would be shared between the Company and the employees annually on a 50% basis.

3. Incentive pay was a plan based on "yards of concrete" delivered compared to a standard determined by the Company. Employees meeting the standard would receive a $.40 per hour in-

crease in wages. Those employees who functioned 5%, 10% or 15% above the standard would receive hourly wage increases of $.50 per hour, $.60 per hour, and $.75 per hour on a weekly basis.

4. Although there were different decreases in the hourly wage rate for Class A mechanics and for employees with fewer than two years of service, we will discuss only the exact reductions for drivers with more than two years experience for the sake of simplicity and because the bulk of the testimony at the hearing was directed toward drivers with more than two years experience.

tion from the current wage rate of $10.27 per hour under the CBA that was going to expire on January 31, 1988.

On February 10, 1988, in its final pre-impasse proposal, the Company proposed to reduce the current fixed hourly wage rate of $10.27 per hour to $9.50 per hour (instead of the $9.00 per hour offered in prior proposals) in conjunction with implementing the gain sharing and incentive pay plans and a retirement savings plan. The Company also proposed a Company-sponsored health insurance plan, which was a change from the Choice Care plan provided under the expired agreement. The Union rejected this final offer, and impasse was reached on February 10, 1988. On March 7, 1988, the Company implemented its final offer and notified the employees of this by memorandum. The fixed hourly wage rate was reduced from $10.27 per hour under the expired agreement to $9.50 per hour and the new gain sharing and incentive pay plans were implemented as the Company had proposed in its final pre-impasse offer on February 10, 1988. The Choice Care Health Plan was terminated and the Company implemented the proposed Company-sponsored health plan.

The parties met on two additional occasions in 1988 in an effort to reach a collective bargaining agreement at which times the Company offered to agree to additional benefits consisting of improvements in the medical insurance plan, the institution of a prescription drug card, and improvements in holiday pay. The Union rejected all of these proposals.

Approximately a year after the previous negotiations, on April 21, 1989, the parties met for further negotiations. The Union members expressed dissatisfaction with the wage plan which had been implemented on March 7, 1988 (i.e., the reduced fixed hourly wage rate of $9.50 per hour in conjunction with gain sharing and incentive pay), indicating that they preferred a higher fixed hourly wage rate, because Union members preferred to know exactly what their earnings

would be under a higher fixed hourly rate rather than the variable amount of total wages that resulted from the reduced rate of $9.50 per hour supplemented with variable earnings from gain sharing and incentive pay.

At the meeting of April 21, 1989, the Company made a final offer proposing to increase the then-existing hourly wage rate of $9.50 per hour, which had been implemented in conjunction with the gain sharing and incentive pay plans on March 7, 1988 after bargaining to impasse the year before. The proposed increase for drivers with more than two years of service was from $9.50 to $9.75 per hour effective May 1, 1989, increasing to $10.00 per hour effective September 1, 1989, and to $10.25 per hour effective January 1, 1990.

The Company proposed to increase the existing fixed hourly wage rate "in lieu of" the gain sharing and incentive pay plans, which it proposed to drop on April 30, 1989. The increase in the fixed hourly wage rate was offered by the Company in conjunction with the proposal to eliminate the gain sharing and incentive pay plans, which had first been implemented on March 7, 1988 to compensate for the loss in wages due to the reduction in the fixed hourly rate from $10.27 to $9.50 per hour. The Union inquired whether the Company would pay the accumulated gain sharing on a pro-rata basis on April 30, 1989.[5]

At the April 21, 1989 meeting, the Company also proposed additional employee costs and plan limitations in its self-insured health care plan detrimental to the employees. In addition, the Company offered numerous improvements to the health plan beneficial to the employees. The Union insisted on the adoption of the Teamster health plan, but the Company rejected that proposal and insisted on continuing a self-administered plan.

The Union rejected the Company's final offer given at the April 21, 1989 meeting and impasse was reached. On April 24, 1989, the Company distributed a memorandum to its

---

5. In the past, the accumulated earnings from gain sharing had been paid at the end of the year. The Union wanted to make sure the gain sharing earnings accumulated in January–April

1989 would not be lost and would be paid immediately on April 30, 1989 rather than waiting until the end of 1989.

employees, informing them of the terms of its April 21, 1989 final offer. It stated that the Union's "primary concerns" were "a fixed wage increase *in lieu of* gain sharing and incentive pay" (emphasis added). The memorandum stated that the Company's final offer proposed three $.25 per hour wage increases effective May 1, 1989, September 1, 1989, and January 1, 1990; the elimination of gain sharing and incentive pay; the offer to pay for six holidays; and both improvements and increased costs in the health plan.

On May 1, 1989, the Company implemented portions of its final pre-impasse offer made at the April 21, 1989 meeting. The Company retained the existing fixed hourly wage rate of $9.50 per hour, but eliminated both the gain sharing and incentive pay plans. The Company did not implement the three $.25 per hour wage increases which it had proposed. In addition, the Company implemented the portions of its medical package which represented additional costs or limitations of benefits detrimental to employees, but did not implement proposed beneficial changes to the employees' health plan. The Company paid to employees the gain sharing earnings accumulated under the prior wage plan in a lump sum on April 30, 1989.

On the basis of the foregoing facts, the NLRB found that the Company violated section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), by implementing on May 1, 1989 only portions of the wage and health plans presented in its final pre-impasse offer of April 21, 1989.

The Board's order required the Company to cease and desist from refusing to bargain in good faith with the Union, to rescind its unlawful implementations, to reinstate the wage plan that existed prior to bargaining to impasse on April 21, 1989 (the $9.50 per hour fixed wage rate plus incentive pay and gain sharing) and the health plan as it existed prior to May 1, 1989.[6] The Board order directed the Company to make whole those employees who may have suffered as a result of the unlawful May 1, 1989 implementations

and to bargain with the Union upon request. The Board's order also required the Company to post an appropriate notice.

## II.

We must first decide whether substantial evidence supports the Board's finding that the Company violated § 8(a)(5) of the NLRA on May 1, 1989 by implementing a post-impasse wage plan inconsistent with its pre-impasse wage proposals to the Union.

■ Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." Section 8(d) of the Act, 29 U.S.C. § 158(d), establishes "the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment....'" *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). Thus, unilateral action with respect to any mandatory subject of bargaining is prohibited "for it is a circumvention of the duty to negotiate which frustrates the objective of section 8(a)(5) much as does a flat refusal." *NLRB v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *Accord NLRB v. Allied Prods. Corp.*, 548 F.2d 644, 652 (6th Cir.1977). Notice and an opportunity to bargain about proposed changes are essential to the collective bargaining process. If an employer changes wages or other terms without affording the Union an opportunity for adequate consultation, it "minimizes the influence of organized bargaining" and emphasizes to the employees "that there is no necessity for a collective bargaining agent." *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145 (1945); *Accord NLRB v. J. H. Allison & Co.*, 165 F.2d 766, 770 (6th Cir.), *cert. denied*, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).

■ For these reasons, during bargaining negotiations, an employer violates section 8(a)(5) of the Act if it unilaterally institutes

---

**6.** Because there was a violation of section 8(a)(5), the ALJ reinstated the wage and health plans as they existed prior to bargaining to impasse on April 21, 1989 instead of implementing the final proposal of the Company.

changes in existing terms or conditions of employment prior to bargaining to impasse. *United Paperworkers Int'l Union. v. NLRB,* 981 F.2d 861, 866 (6th Cir.1992); *Peabody Coal Co. v. NLRB,* 725 F.2d 357, 365 (6th Cir.1984). After the parties have bargained to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are "reasonably comprehended within his pre-impasse proposals," *United Paperworkers,* 981 F.2d at 866, and are consistent with the offers the Union has rejected. *Southwest Forest Indus., Inc. v. NLRB,* 841 F.2d 270, 273 (9th Cir.1988). Although an employer's power to change working conditions is not contingent upon Union agreement with the proposed changes, notice and opportunity to consult is required before implementing changes in order to give the Union a reasonable opportunity to offer counter arguments and proposals. *A.H. Belo Corp. v. NLRB,* 411 F.2d 959, 971 (5th Cir.1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). Therefore, the employer may not implement changes "which are substantially different from ... any which the employer has proposed during its negotiations...." *NLRB v. Crompton–Highland Mills, Inc.,* 337 U.S. 217, 225, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949). As the Fifth Circuit has stated, "implementing changes significantly different from those proposed to and rejected by the collective bargaining representative is tantamount to implementing changes without notifying the Union of the proposed changes." *Winn–Dixie Stores, Inc. v. NLRB,* 567 F.2d 1343, 1350 (5th Cir.), *modified on other grounds,* 575 F.2d 1107 (5th Cir.), *cert. denied,* 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

The issue in the present case is thus whether in its final offer before bargaining to impasse on April 21, 1989, the Company presented its economic proposal (dropping the incentive pay and gain sharing plans and increasing the fixed hourly wage rate) as a comprehensive, integrated whole, which the Union "reasonably comprehended" would be implemented in its entirety, or as separate items, which the Union "reasonably comprehended" could be implemented separately,

i.e., that the gain sharing and incentive pay plans would be eliminated, but there would be no increase in the fixed hourly wage rate.

 The standard of review in determining whether a post-impasse change in employment conditions is reasonably comprehended within the final pre-impasse offer to the Union is a mixed question of fact and law. The Board's factual findings must be upheld if supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *NLRB v. Brown–Graves Lumber Co.,* 949 F.2d 194, 196 (6th Cir.1991). The Board's conclusions of law must be affirmed if they are based upon a reasonably defensible construction of the Act. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 498, 99 S.Ct. 1842, 1849–50, 60 L.Ed.2d 420 (1979); *NLRB v. Local Union No. 103, Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *General Truck Drivers, Local No. 957 v. NLRB,* 934 F.2d 732, 735 (6th Cir. 1991). Finally, the facts and complexities of the bargaining process are "particularly amenable to the expertise of the Board as factfinder," and "few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board [that] deals constantly with such problems." *Bolton–Emerson, Inc. v. NLRB,* 899 F.2d 104, 108 (1st Cir.1990); *NLRB v. Hospitality Motor Inn, Inc.,* 667 F.2d 562, 563 (6th Cir.), *cert. denied,* 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982).

 In the present case, the NLRB contends that the Company's retention on May 1, 1989 of the $9.50 fixed hourly wage rate and elimination of the gain sharing and incentive pay plans was an unlawful unilateral action because such a proposal had never been presented to the Union by the Company in its prior offers, and, therefore, the Union did not "reasonably comprehend" that there would be a retention of the $9.50 per hour wage rate without the additional earnings from the gain sharing and incentive pay plans. The NLRB contends that the Company had proposed that in lieu of incentive pay

and gain sharing, employees would receive three $.25 per hour increases to the existing fixed hourly rate of $9.50 per hour. However, although the incentive pay and gain sharing plans were dropped post-impasse, employees never received the proposed $.25 per hour wage increases, and thus received less in total wages than what the Company had offered in its pre-impasse proposals. The NLRB held that "the implemented rate of $9.50 an hour together with the elimination of the plans formed no part of any [of the Company's] collective bargaining offer and therefore played no part in any union consideration or rejection and played no part in the impasse." Joint Appendix, p. 22.

The Board found that the Company's retention of the $9.50 fixed hourly wage rate without the incentive pay and gain sharing plans was as different from the final offer as the implementation in *Winn–Dixie* was. In *Winn–Dixie*, 567 F.2d at 1349, the employer bargained to impasse with the Union over a proposed wage increase of 5.5%, but implemented wage increases ranging from 4.11% to 6.23%. In *Winn–Dixie*, the Fifth Circuit found that the increases granted by the employer differed "significantly" from the 5.5% increase that the Company had proposed in its pre-impasse offers and thus were unlawful unilateral implementations about which the Union had neither notice nor an opportunity to respond. *Id.* at 1350. In the present case, the Board concluded that similarly the dropping of incentive pay and gain sharing without implementing the proposed increases in the fixed hourly wage rate was different from what was proposed in the Company's final offer, which had indicated that there would be "a fixed wage increase in lieu of gain sharing and incentive pay."

Respondent Plainville contends that it lawfully implemented portions of its final pre-impasse wage offer because the elimination of the gain sharing and incentive pay plans was an explicit part of its final proposal of April 21, 1989, separate from the proposed increase in the fixed hourly wage rate, and that the elimination of these plans without a concomitant increase in the fixed hourly wage rate was "reasonably comprehended" by the Union. The Company relies on *Em-*

*hart Indus., Hartford Div. v. NLRB,* 907 F.2d 372 (2nd Cir.1990) for its argument that post-impasse, an employer may implement any explicit portion of its final offer. In *Emhart,* the Court found that "once an employer bargains in good faith to impasse, its duty to bargain further is suspended, and it is free to impose all—or part—of its pre-impasse proposals, provided its actions were *'reasonably comprehended'* within its earlier offers to the Union." *Id.* at 377 (emphasis added). In the present case, the Company also argues that it did not implement a wage plan different from or inconsistent with its pre-impasse proposals, because by retaining the $9.50 fixed hourly wage rate, "it made no implementation whatsoever," but simply maintained the status quo by leaving the employees' wage rate exactly where it was.

The ALJ found, and the Board adopted the finding, that on May 1, 1989, the Company unlawfully eliminated the gain sharing and incentive pay plans without increasing the fixed hourly wage rate because this elimination had not been proposed as a separate, unrelated item in its pre-impasse wage offer to the Union, but had only been proposed in conjunction with an increase in the fixed hourly wage rate. Because the Company did not implement the proposed increase in the fixed hourly wage rate when it dropped gain sharing and incentive pay, the Company violated § 8(a)(5) of the Act by taking a unilateral action that was not "reasonably comprehended" within its pre-impasse proposals.

We review the factual findings of the Board under a substantial evidence standard. *Universal Camera,* 340 U.S. at 487–88, 71 S.Ct. at 463–65. We find that there is substantial evidence to support the Board's conclusion that in its pre-impasse offer of April 21, 1989, the Company treated the proposed fixed hourly wage rate increase and elimination of the gain sharing and incentive pay plans as a "total package deal" in regard to the amount of wages the employees would receive, and that the elimination of the incentive pay and gain sharing plans without a concomitant increase in the fixed hourly wage rate was inconsistent with its final pre-impasse offer.

There is substantial evidence in the record to support the Board's factual determination that before bargaining to impasse in 1989 the Company consistently treated the (1) proposed increase in the fixed hourly wage rate as *quid pro quo* for the (2) elimination of the gain sharing and incentive pay plans and put forth these two components of the wage plan as a comprehensive, integrated wage offer. Squire T. Griffin, the union bargainer, whom the ALJ determined was a credible witness, testified that in the 1988 and 1989 bargaining sessions, the Company consistently linked the fixed hourly wage rate it proposed to whether or not the hourly rate would be supplemented by gain sharing and incentive pay. In January 1988, when the Company first presented its proposal to reduce the then-existing hourly rate of $10.27 per hour, it did so in conjunction with proposing to add the gain sharing and incentive pay plans. He testified that in the 1988 bargaining sessions, the proposed wage plan was always presented as a total package deal, and that the Union was told that earnings under the proposed wage plan could equal or exceed the wages they had received under the expired CBA at a fixed rate of $10.27 per hour even though the fixed hourly wage rate was going to be reduced. Griffin testified that the Company demonstrated this proposition by having Mr. Lawrence write figures on a blackboard, showing examples of how the proposed reduced hourly wage rate of $9.00 per hour would be supplemented by a variable rate per hour based on incentive pay and gain sharing to try to convince the Union members that under the new plan (hourly wage rate reduction plus incentive pay and gain sharing), the Union members could equal or exceed what they were presently making at a fixed rate of $10.27 per hour.[7] Griffin testified that in all five proposals which the Company presented to the Union before bargaining to impasse on February 10, 1988, the comparison between the current fixed hourly wage rate and a reduced fixed hourly wage rate supplemented by wages from incentive pay and gain sharing was made. Griffin testified that the Union preferred a higher fixed hourly wage rate instead of a reduced one supplemented by earnings from the gain sharing and incentive pay plans, because Union members wanted to know exactly what they were getting, and they were fearful of a recession, which could wipe out any additional earnings from incentive pay or gain sharing. Griffin testified that the comparison between the $10.27 per hour wage rate under the expired contract and the amount to be earned per hour under a lower fixed hourly wage rate plus a variable rate from gain sharing and incentive pay was made from proposal number one through the final pre-impasse offer made on February 10, 1988, proposal number five. Thus, at every meeting, there was a comparison between the current earnings under the existing fixed hourly wage rate and the total earnings possible under the Company's new wage proposal, leading the Union to "reasonably comprehend" that if the Union reduced the fixed hourly wage rate, it would do so only in conjunction with implementing the gain sharing and incentive pay plans, which would allow employees an opportunity to recoup wages lost due to the reduction in the fixed hourly wage rate.

On March 7, 1988, the Company implemented the $9.50 per hour reduced fixed hourly wage rate plus the gain sharing and incentive pay plans it had offered in its final pre-impasse proposal on February 10, 1988. Griffin testified that the actual earnings under the new program compared to earnings under the prior wage plan varied according to the work performed by the Company. During a good work week, an employee could earn as much as $.75 more per hour through the incentive pay and gain sharing plans.

7. Specifically, Griffin testified that Lawrence used figures on a blackboard to demonstrate that the wages at the reduced per hour rate plus wages gained from gain sharing and incentive pay could give Union members more money than they were currently earning. Griffin testified that Lawrence drew lines to bring in the amount to be earned from gain sharing and translated the estimated amount into exact dollars per hour and then calculated the additional dollars per hour to be gained from incentive pay. Griffin testified that Lawrence put the figures from each category,—fixed hourly wages, incentive pay, and gain sharing—and totaled them to come up with a figure of $10.67 or $10.70 per hour to demonstrate that the total wage package could equal or exceed what the Union members were currently making.

He testified that in 1988 before bargaining to impasse, the Company never proposed a reduction in the fixed hourly wage rate without also proposing gain sharing and incentive pay as a way to recoup wages lost from the reduction. He testified that, likewise, subsequently in April 1989 when bargaining to impasse for a second time, the Company never discussed dropping the gain sharing and incentive pay plans without also discussing a concomitant raise in the fixed hourly wage rate. Griffin testified that at the April 21, 1989 meeting, the Company informed the Union that it was going to eliminate gain sharing and incentive pay because the Union wanted a higher fixed hourly wage rate instead; the Company stated that in lieu of gain sharing and incentive pay, it proposed to implement three hourly rate increases to $9.75, $10.00, and $10.25 per hour over an eight month period. He testified that at no time during the bargaining session of April 21, 1989 did the Company indicate it was proposing to eliminate the gain sharing and incentive pay plans without also increasing the fixed hourly wage rate, which is what the Union had consistently requested—elimination of gain sharing and incentive pay in exchange for a higher fixed hourly wage rate.

Based on Griffin's testimony, we believe there is substantial evidence in the record to support the ALJ's factual determination that in 1989 the Company presented its wage proposal (an increase in the fixed hourly wage rate in lieu of gain sharing and incentive pay) as a comprehensive, integrated whole, not as separate, unrelated items, and therefore, the Company's fragmented implementation on May 1, 1989 of only a portion of the wage proposal presented at the April 21, 1989 meeting was inconsistent with its final pre-impasse offer to the Union. Contrary to the Company's contention, it was the Company, not the Union, that first linked the fixed hourly wage rate to whether or not it would be supplemented with earnings from gain sharing and incentive pay. Moreover, the testimony of Griffin is consistent with the testimony of the Company's vice president, who described the function of the increased pay offer in the April 1989 proposal as "a response to the Union's concern for a ... fixed wage increase in lieu of [the plans]...." After telling the Union that it was implementing gain sharing and incentive pay in 1988 to help employees recoup wages lost due to the reduction in the fixed hourly wage rate, the Company indicated in its final offer of April 21, 1989 that it was going to drop the unpopular gain sharing and incentive pay plans in order to respond to the Union's desire for a higher fixed hourly wage rate, which the Company then offered to provide, leading Union members to reasonably comprehend that when gain sharing and incentive pay were eliminated, they would receive the proposed increases in the fixed hourly wage rate.

Evidence which supports Griffin's testimony is also provided by the memo of April 24, 1989, which the Company sent to all Union members to clarify the final offer it had made at the April 21st meeting. The letter stated that the Company had listened to what the Company believed were the Union's primary concerns, "notably *a fixed wage increase in lieu of gain sharing and incentive pay* ... and a better health plan." (emphasis added). In light of these concerns, the Company proposed the following in regard to wages:

> The most important points of our final proposal that we gave to your Union at that meeting are as follows:

| WAGES Drivers and Yard employees | 5/1/89 | 9/1/89 | 1/1/90 |
|---|---|---|---|
| | +.25/hr. | +.25/hr. | +.25/hr |

> Gain Sharing dropped on 4/30/89. Gain sharing from 1/1/89 through 4/30/89 will be paid on a pro-rata basis. We will compute the payment from a base of $150.00.

> Incentive pay will be dropped on 4/30/89.

Joint Appendix, p. 145. Nowhere in this letter did the Company give *notice* to the Union that it was contemplating keeping the fixed hourly wage rate at $9.50 per hour at the same time as dropping incentive pay and gain sharing.

We find that the implemented change from a total variable wage package (based on a fixed rate of $9.50 per hour, plus a variable addition in wages due to gain sharing and incentive pay) to a fixed wage package at a rate of $9.50 per hour (with no supplement in wages from gain sharing or incentive pay)

was an overall reduction in wages that the Company did not propose in its final pre-impasse offer of April 21, 1989 and to which the Union was not given an opportunity to respond by presenting counter arguments and proposals. Instead, the Company's final offer indicated that when the gain sharing and incentive pay plans were dropped, there would be three $.25 per hour increases in the fixed hourly wage rate.

Furthermore, the stipulation of facts, agreed to by both the Company and the Union, states:

> On April 21, 1989, the parties met again for further negotiations. At that meeting, the Employer offered its proposal No. 8, which included an increase in the hourly wage rate implemented on March 7, 1988. The higher wage rate proposal was offered by the Employer *in conjunction* with a proposal to eliminate the gain sharing and incentive pay plans implemented on March 7, 1988.

Joint Appendix, p. 139 (emphasis added). We believe the words "in conjunction with" indicate that the Company was offering an integrated economic package in which the amount of the fixed hourly wage rate was based on whether or not it would be supplemented by additional wages from gain sharing and incentive pay. The Company argues that the fixed hourly wage rate and the supplementary pay plans were nothing more than the separate elements of a final proposal for a complete collective bargaining agreement. Contrary to the Company's contention, there is substantial evidence in the record to support the ALJ's factual determination regarding the Company's "objective manifestation of intent"—that the Company did not treat the elimination of gain sharing and incentive pay and the increase in the hourly wage rate as separate elements of the wage offer unrelated to each other, which could each stand on its own, but treated them instead as two inextricably linked components of a comprehensive, integrated wage offer.

The Company contends that the fixed hourly wage rate remained the same pre-and post-impasse—$9.50 per hour—and thus, there was no unilateral change; it simply maintained the status quo. We believe this argument has no merit. The total earnings under the pre-and post-impasse wage plans did not remain the same. Before bargaining to impasse on April 21, 1989, the wage rate was $9.50 per hour, plus the variable amount per hour earned from gain sharing and incentive pay, which the Company had translated into additional dollars per hour when it first introduced its plan to reduce the fixed hourly wage rate from $10.27 per hour in January and February 1988. In its final pre-impasse proposal on April 21, 1989, the Company indicated there would no longer be a variable amount earned from gain sharing and incentive pay, but instead there would be a higher fixed hourly wage rate because there would be three $.25 per hour increases to the then-existing $9.50 per hour wage rate. Following bargaining to impasse on April 21, 1989, the fixed hourly wage rate was $9.50 per hour minus the incremental increase in dollars per hour that resulted from the gain sharing and incentive pay plans. Thus, the total wage package in effect prior to bargaining to impasse on April 21, 1989 based on a fixed rate of $9.50 per hour plus supplemental earnings based on gain sharing and incentive pay was replaced on May 1, 1989 with a fixed rate of $9.50 per hour with no possibility of an increase in wages from the gain sharing and incentive pay plans. Thus, what was implemented on May 1, 1989 did not maintain the status quo and was significantly different from what the Company had offered to the Union in its final pre-impasse proposal, which indicated that in lieu of gain sharing and incentive pay, there would be an increase in the fixed hourly wage rate to $9.75 per hour effective May 1, 1989, increasing to $10.00 per hour effective September 1, 1989, and to $10.25 per hour on January 1, 1990. By not implementing the hourly wage increases as proposed, the Company implemented a wage plan that was significantly different from the one it had proposed in its final pre-impasse offer. The Company did not maintain the status quo, as it alleges, because the Company reduced the Union members' overall wage package from one consisting of a fixed rate of $9.50 per hour, *plus* a variable incremental rate per hour based on gain sharing and incentive pay, to

one consisting *solely* of a fixed rate of $9.50 per hour without giving the Union notice or an opportunity to bargain about this overall reduction in wages. Thus, although the fixed hourly wage rate component of the wage plans remained the same pre-and post-impasse, there was an overall reduction in wages that had not been proposed to the Union. The Union was not given notice or an opportunity to bargain over this reduction in wages, and thus § 8(a)(5) was violated.

As the ALJ stated in its opinion:

In the instant case, the Union demanded, and Respondent offered, a "fixed wage increase in lieu of gain sharing and incentive pay." The two supplementary plans, on this record, were integral to the existing "wages" of unit employees. In substance, Respondent *offered* $9.75 per hour for the first 4 months, $10 per hour starting September 1, 1989 and $10.25 per hour commencing January 1, 1990, together with the elimination of gain sharing and the incentive pay plans commencing with the new contract. Respondent *implemented* at the existing, retained hourly rate for drivers at $9.50 per hour and eliminated the gain sharing and incentive pay plans. The plans, on this record, were instituted as a wage device to help escape the reduced fixed wage rate in 1988. The elimination of these plans in 1989 was, I find, according to the intent of the parties, entirely conditional upon the Union's acceptance of [the higher] fixed rate. Respondent's May, 1989 implemented wage level ($9.50 per hour) was never offered to, considered by or even rejected by the Union. The implemented rate of $9.50 an hour together with the elimination of the [gain sharing and incentive pay] plans formed no part of any Respondent collective-bargaining offer and therefore played no part in any union consideration or rejection and played no part in the impasse.

Joint Appendix, p. 22 (citations omitted). We agree with the ALJ that the Union employees did not receive notice or an opportunity to bargain over this reduction in their total wage package because they were led to believe that the Company was going to in-

crease the fixed hourly wage rate if it eliminated gain sharing and incentive pay.

Thus, the Company's argument that the present case is distinguishable from *Winn–Dixie* because the fixed hourly wage rate remained the same is specious. Although the $9.50 per hour fixed hourly wage rate component remained the same pre-and post-impasse, this was different from what had been proposed to the Union because the Company never proposed keeping the fixed hourly wage rate at $9.50 per hour at the same time as dropping incentive pay and gain sharing, but instead offered three $.25 per hour hourly wage increases "in lieu of gain sharing and incentive pay." In the present case, because there was a wage implementation that was different from the one contained in pre-impasse proposals, this case is similar to *Winn–Dixie*, 567 F.2d at 1350, which states that implementation of a wage plan different from the one proposed in pre-impasse proposals is a prohibited unilateral action. *See also Technicolor Gov't Servs., Inc. v. NLRB*, 739 F.2d 323, 327–28 (8th Cir.1984) (court rejects Company's argument that there had been no change in employee wages because pay that employees receive when working as "leads" was "integral part of the Company's wage structure"); *Peerless Roofing Co., Ltd. v. NLRB*, 641 F.2d 734, 735–36 (9th Cir.1981) (unlawful unilateral implementation where payments to Union trust funds were discontinued; although employer and Union discussed fringe benefits, including trust fund contributions, employer had never proposed terminating all payments to the union trust funds); *Dallas Gen. Drivers, etc., Local Union No. 745 v. NLRB*, 500 F.2d 768, 769–70 (D.C.Cir.1974) (unlawful unilateral action where employer implemented a $.05 per hour wage increase, which was different from the plan discussed with the Union that had tied a wage increase to a three-year contract); *Korn Indus., Inc. v. NLRB*, 389 F.2d 117, 121 (4th Cir.1967) (in finding that employer's "wage increase was inextricably linked with its merit [evaluation] system," court stated that "[b]argaining does not take place in isolation").[8]

---

8. The Company offers as evidence that it consis- tently treated the fixed hourly wage rate as sepa-

Because the elimination of gain sharing and incentive pay without a concomitant increase in the fixed hourly wage rate was not "reasonably comprehended" in the Company's final pre-impasse offer, the present case is distinguishable from *Emhart Indus.*, 907 F.2d at 376–77, in which the court found that the separate components of a reinstatement procedure for striking employees had been explicitly proposed as separate items, and had been "reasonably comprehended" as separate, not related, entities, and thus implementation of a portion of the final strike reinstatement plan proposed was not an unlawful unilateral action. In *Emhart Indus.*, the court found that the implementation of a "plant-wide seniority system" had been explicitly mentioned in pre-impasse proposals and was not a relatively "small part" of the pre-impasse offers, and therefore could be implemented without implementing the entire pre-impasse offer. In contrast, in the present case, the retention of a $9.50 per hour fixed hourly wage rate without gain

sharing and incentive pay was *never* mentioned as a proposed future wage rate in the April 21, 1989 collective bargaining session, was not an explicit or recognizable part of the final offer, and, thus, was not a part of the Company's 1989 wage offer or the Union's rejection. The Company indicated it was offering a "fixed wage increase in lieu of gain sharing and incentive pay" and never indicated that there would be no increase in the fixed hourly wage rate if these plans were dropped. Thus, although the Company gave bargaining notification that the incentive pay and gain sharing plans would be eliminated, there was no notification, identifiable in its final pre-impasse proposal, that the Company planned to retain the fixed hourly wage rate at $9.50 per hour when it dropped the supplemental pay plans.[9]

We find that there is substantial evidence to support the ALJ's determination that elimination of the gain sharing and incentive pay plans was entirely conditional on the

---

rate from the gain sharing and incentive pay plans, the fact that on February 10, 1988, the Company proposed to both increase its fixed hourly wage rate offer and to retain both the gain sharing and incentive pay plans. However, this argument is specious. On February 10, 1988, even though the Company stated it would only reduce wages from $10.27 per hour to $9.50 per hour (whereas in its prior offers, it had proposed a reduction from $10.27 to $9.00 per hour), this rate of $9.50 per hour was not an increase over the then-existing rate of $10.27 per hour, but a decrease, which was to be supplemented by wages from incentive pay and gain sharing. Thus, the Company did not offer both to increase the *existing* wage rate and to supplement wages with gain sharing and incentive pay as it alleges.

Likewise, the Company's assertion that the Union itself treated the elimination of gain sharing and incentive pay separately from the proposed hourly wage rate increases has no merit. The Company contends that the Union requested at the April 21, 1989 bargaining session to have the gain sharing paid on a pro-rata basis as of April 30th, when the gain sharing plan was to be dropped, whether or not it accepted the Company's final offer. The contention that this indicates that the Union knew that incentive pay and gain sharing would be dropped even if there was no increase in the fixed hourly rate is without merit. The Union's request reasonably contemplated that if it rejected the Company's final offer of three $.25 per hour increases without gain sharing and incentive pay, the Company was free to implement the wage increases without gain sharing and incentive pay. Thus, the gain shar-

ing/incentive pay plans would have been eliminated regardless of whether the Union accepted the Company's final proposal or not. In that circumstance, the Union was reasonably concerned about when it would receive the gain sharing distribution accumulated from January through April 30, 1989, when that plan was to be dropped. As the Board found, a distribution of gain sharing on a pro-rata basis—on April 30, 1989 rather than at the end of the year—demonstrated a method and a time of payment for the gain sharing that had accumulated, not an acknowledgement by the Union that gain sharing and incentive pay would be dropped even if the hourly wage rate was not increased, but remained at $9.50 per hour.

9. In contrast, in the memorandum sent to employees clarifying the final pre-impasse offer of February 10, 1988, the Company had stated that there would be no change in the way overtime pay was calculated. Thus, it is evident that when the Company proposed to make no change in a wage component, it knew how to give notice to the Union of this intention. Significantly, the memorandum sent to employees to clarify the final pre-impasse offer of April 21, 1989 *did not state* that there would be no change in the existing fixed hourly wage rate of $9.50 per hour, but instead stated that there would be three $.25 per hour increases. The Company thus failed to give the Union notice of its intention to retain a $9.50 per hour fixed hourly wage rate in conjunction with the elimination of gain sharing and incentive pay in its final pre-impasse offer of April 21, 1989.

Company's proposed increases in the fixed hourly wage rate and that implementation of the existing fixed hourly wage rate of $9.50 per hour without the remuneration flowing from gain sharing and incentive pay ran counter to the manifest bargaining positions of both the Union and the Company prior to bargaining to impasse on April 21, 1989. Thus, rather than coming within the line of cases upholding the lawful implementation of part, but not all, of a final pre-impasse offer, such as *Emhart* and *Presto Casting Co.*, 262 NLRB 346 (1982), *enforced in part and denied in part on other grounds*, 708 F.2d 495 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983), this case comes within the forbidden area of *Peerless Roofing Co.*, 641 F.2d at 735–36 and *Winn–Dixie*, 567 F.2d at 1350, because the Company's implementation was not reasonably comprehended within its final pre-impasse proposal to the Union.

There is substantial evidence that the Union had repeatedly rejected the Company's wage proposals containing the gain sharing and incentive pay plans as a way to supplement a reduction in the fixed hourly wage rate, that the Company in the April 21, 1989 bargaining session consistently treated the three $.25 per hour wage increases as *quid pro quo* for the elimination of gain sharing and incentive pay, and that the Union "reasonably comprehended" that it would receive the three $.25 per hour wage increases which had been proposed if the gain sharing and incentive pay plans were going to be dropped. By changing the total wage package from one based on a fixed $9.50 per hour wage rate plus an additional amount to be earned through gain sharing and incentive pay to one based solely on a fixed rate of $9.50 per hour not supplemented by gain sharing and incentive pay was a change in the terms and conditions of employment not encompassed in the Company's prior offer to the Union, which had indicated there would be a wage increase in the fixed hourly wage rate when the gain sharing and incentive pay plans were dropped.[10] These components of the wage plan were never put forth as separate, unrelated items, but were always presented as a comprehensive, integrated whole. As the ALJ pointed out, "there must remain some substantial meeting of the minds as to what the employer's offer is, and what the Union's contemplation and rejection are, in order that the concept of impasse retain an intelligible position in the collective-bargaining process." Joint Appendix, p. 23. Since a fixed rate of $9.50 per hour was never offered in conjunction with the elimination of gain sharing and incentive pay by the Company, it was not reasonably considered by Union members, who "reasonably comprehended" that they would receive three $.25 per hour rate increases "in lieu of gain sharing and incentive pay." The unilateral implementation of the $9.50 per hour wage rate without the two supplementary gain sharing and incentive pay plans thus violated section 8(a)(5) of the Act.

To conclude, the Company violated section 8(a)(5) of the Act, because following a lawful impasse, it implemented a wage proposal inconsistent with its pre-impasse offers. Because the Union received a wage package that was significantly different from what was offered in the Company's final pre-impasse proposal, the Company made a unilateral implementation that was not "reasonably comprehended" by the Union. The Board correctly concluded that the unilateral imple-

---

**10.** The fact that the Company had proposed a $9.50 per hour fixed wage rate in the 1988 collective bargaining sessions and had implemented it post impasse on March 7, 1988, does not mean that the $9.50 per hour wage rate was on the table as a proposed future wage rate during the 1989 bargaining session. The Company could have kept the existing $9.50 per hour fixed wage rate while eliminating gain sharing and incentive pay as long as it made clear to the Union, its intention of doing so. Instead, the Company indicated in its final offer that it intended to give three $.25 per hour wage increases in lieu of gain sharing and incentive pay. After impasse was reached, the Company could either have retained the existing wage plan consisting of a $9.50 per hour fixed hourly rate in conjunction with gain sharing and incentive pay or implemented the plan proposed in its final offer. However, it did neither, and, instead, unlawfully unilaterally implemented only a portion of its final wage offer, which it had consistently treated as comprehensive integrated whole, without giving the Union notice or an opportunity to bargain on the elimination of gain sharing and incentive pay without a concomitant increase in the fixed hourly wage rate.

mentation was unlawful, and, therefore, its order that the Company return to its pre-impasse wage plan is hereby affirmed.[11]

## III.

■■■ We must next decide whether substantial evidence supports the Board's finding that the Company violated § 8(a)(5) of the NLRA by implementing a post-impasse health plan inconsistent with its final pre-impasse proposal to the Union.

The collective bargaining agreement that expired on January 31, 1988 included the "Choice Care" health plan for unit employees, which consisted of hospitalization and doctor bill coverage, drug prescriptions, and life insurance. Employees with family coverage paid $36.45 per month of the premium and the Company paid all of the single employee premium.

During negotiations in January and February 1988, the Company proposed a new self-insured health insurance plan. The Union proposed a return to the Teamsters' health insurance plan, which had been in effect under prior contracts. After impasse was reached on February 10, 1988, the Company implemented its final offer in regard to the health plan on March 7, 1988. Effective April 1, 1988, a deductible hospitalization and medical benefits plan, self-funded by the Company and administered by Brunswick Administrative Services, Inc., was established.

During the negotiations which occurred a year later, the Company made a final offer to the Union on April 21, 1989, in which the premium for family coverage increased from $166.34 per month to $391.70 per month. The employee was to pay $19.00 per week, plus 50% of any increase over the $391.70 premium. Proposed deductibles before the insurance coverage commenced rose from $200 to $600 per family, a 200% increase. Co-payments for out-of-pocket maximums were $750 per calendar year for individuals; $2,250, for families. The Company's final

offer also limited drug and alcohol treatment programs to $10,000 lifetime maximums and psychological treatment to 30 days per year.

Additional improvements to the existing health plan offered in the final pre-impasse proposal on April 21, 1989 included a voluntary vision care program, a prescription drug card, elimination of the $100 deductible for hospital omissions, and emergency care and care for a life threatening medical condition not to exceed a maximum of $300 per injury.

During the negotiations, the Union continually proposed reinstatement of the Teamsters' health plan, which had been in effect under prior contracts. The Company continually rejected that proposition. According to the testimony of the Union bargainer, Griffin, in the last bargaining session on April 21, 1989, the Company, in reviewing its health plan provision, told the Union "that this was going to be the plan; that this was what they were going to get." The Company's attorney, Lawrence, denied this testimony, stating that he told the Union bargainers that the Company was willing to make some changes in the health plan from its existing proposal. The Union bargainer, Griffin, testified that the ten items appearing in the Company's final health insurance offer were each read by the parties and compared in cost to the Teamster plan, but there was no discussion of the items in relation to each other. Upon the Union's objection to some of the items, the objections were discussed and then dismissed by the Company's bargainer, who would not agree with the Union's objections.

After impasse was reached when the Union rejected the Company's final offer of April 21, 1989, the Company, on May 1, 1989, implemented only a certain number of the ten items appearing in its final pre-impasse health insurance offer. For example, it implemented the increase in deductibles (for individuals, $200 per calendar year; for families, $600 per calendar year); it now required single employees to contribute $10 per week; it changed the cost of family plan coverage to

---

**11.** Such a finding does not require an employer to implement its entire final offer as the Company contends. It only requires that if an employer wishes to implement portions of its final offer, that the separate portions must have been "rea-

sonably comprehended" as separate in the pre-impasse offers, and a wage package, which is presented as a single, integrated whole, must be implemented in its entirety.

$19 per week plus 50 percent of any increase in the premium over the proposed $391.71 per month premium, which was double the former premium of $166.34. The Company did not implement the beneficial elements in its offer which included the prescription drug card, the voluntary vision care plan, and an emergency care plan.

The ALJ found that the Company had engaged in an unfair labor practice in violation of section 8(a)(5) of the NLRA by implementing only the negative portions of the health plan. The ALJ held "that the elements of the plan do bear an economic and functional relationship to each other; and that to implement only parts of the plan, *a fortiori* those parts of the plan principally detrimental to the employees, is an unlawful implementation."

The Company argues that factually and legally the Second Circuit's opinion in *Emhart*, 907 F.2d at 377, is indistinguishable from the present case and requires that the ALJ be reversed. The Company argues that under *Emhart*, after bargaining to impasse, an employer may implement any portion of its final proposal that was an explicit part of the final offer rejected by the Union. We disagree with such a broad reading of *Emhart*.

A close reading of *Emhart* reveals the following. In *Emhart, id.* at 374, the Second Circuit reviewed a petition for enforcement of a Board order that found that Emhart had committed an unfair labor practice almost six years earlier when, after reaching impasse with the Union, it implemented part, but not all, of its final proposal for reinstating strikers ("the strike settlement agreement").

In *Emhart*, when a three-year collective bargaining agreement between the parties expired in September 1982, the Union went out on strike. After striking for a little over six months, the Union sent a telegram to Emhart unconditionally offering to return to work the next day. After exchanging several telegrams, Emhart agreed to resume operations and begin the reinstatement of workers. However, when it began reinstating workers, it did so not by "plant-wide seniority," as the Union had expected, but by "seniority within classification." *Id.* at 374. The Union imme-diately filed a number of grievances with the company, one of which involved the order of reinstatement. During the summer and fall of 1983, the parties negotiated about the reinstatement of strikers, but were unable to come to agreement, and the company continued to reinstate strikers according to seniority-within-classification. On February 10, 1984, Emhart informed the Union that all future vacancies would be filled according to plant-wide seniority, a system that remained in effect ever since. No one disputed that Emhart thereby unilaterally changed the reinstatement procedure for strikers without the Union's consent. *Id.* at 375.

The Union charged that the company's unilateral change in the reinstatement procedure—a mandatory subject of bargaining—constituted an unfair labor practice in violation of §§ 8(a)(1) and (5) of the Act. After a hearing, an ALJ rejected the complaint and held that Emhart did not violate the Act when it implemented the new reinstatement procedure. According to the ALJ, reinstatement by plant-wide seniority, "while not identical with its last offer, adopted substantially the procedure that had been urged by the Union since the ending of the strike," and was "certainly within the spirit of the negotiations." Therefore, the ALJ concluded that Emhart's action fit within the well-established principle that following impasse, an employer may lawfully make unilateral changes in working conditions that are reasonably comprehended within its pre-impasse proposals to the Union. *Id.* at 376.

More than three and a half years later, and after the parties had signed two intervening contracts featuring reinstatement by plant-wide seniority, the NLRB reversed the ALJ's decision and held that Emhart's implementation of "plant wide seniority" in February 1984 was a violation of the Act. The Board stated that reinstatement by plant-wide seniority reflected only a relatively small part of the comprehensive strike settlement system proposed by Emhart in its final offer in November 1983 and differed significantly from Emhart's final proposal because it did not include a "recall selection form." For these reasons, the Board concluded that the change in the reinstatement procedure

was an unlawful unilateral implementation. *Id.*

The Second Circuit in *Emhart* disagreed with the Board's analysis and reversed. The court concluded:

[R]einstatement by plant-wide seniority was surely "reasonably comprehended" within Emhart's November 1983 proposal, even if other aspects of that proposal were not also implemented. Indeed, Emhart's reinstatement procedure was an explicit part of the November proposal.

*Id.* at 377. The court found that Emhart's plant-wide seniority procedure was the central component of its final pre-impasse proposal and rejected the Board's finding that it was only a relatively small part of the proposal. The court in *Emhart* found the Board's emphasis on the recall selection form to be "puzzling, if not inexplicable." *Id.* The court stated that it did not understand the significance of the recall selection form. Although the form had apparently been used before the strike in recalling laid off workers, and one person testified that the parties had agreed to its use in December 1983, there was no testimony whether the recall selection form was ever used after December 1983 or whether its use, if any, was discontinued after the implementation of reinstatement by plant-wide seniority in February 1984. The Second Circuit in *Emhart* stated, "Such slim, ambiguous evidence, without any explanation of its significance, does not constitute 'substantial evidence' of an unfair labor practice." *Id.* at 378. The court in *Emhart* found that Emhart's reinstatement of strikers by plant-wide seniority was "reasonably comprehended" within the final pre-impasse proposal and that its implementation without the recall selection form did not differ significantly from the final pre-impasse proposal it had presented to the Union. Thus, Emhart did not violate the Act by implementing plant-wide seniority after bargaining to impasse, because, while not identical with the last offer, the Company adopted substantially the procedure urged by the Union.

We find that *Emhart* is distinguishable from the present case for several reasons. First, although *Emhart* is a case involving the partial implementation of a final pre-impasse offer, it was not concerned with the negotiations involved in a collective bargaining agreement. In cases which involve the implementation of only a portion or portions of the final proposal for a collective bargaining agreement, the employers did not implement only the negative portions of a separate component of the final proposal, such as a wage plan, health plan, or pension benefit plan, as occurred in the present case, but implemented, for example, the wage plan, but not the benefit plan. In other words, employers implemented portions of the final offer that constituted comprehensive, integrated entities. *See Financial Inst. Employees of America v. NLRB,* 738 F.2d 1038, 1042–43 (9th Cir.1984) (the employer implemented only the economic portions of its offer); *Eddie's Chop House, Inc.,* 165 NLRB 861, 862–63 (1967) (the employer implemented its proposed Christmas bonus, but made no implementation with respect to wages, pensions, or union security); *Presto Casting Co.,* 262 NLRB at 354–55 (implementation of proposed wage increase, classifications, and grade sections without implementing benefit portions of final offer does not violate the Act). It should be noted that in *Presto Casting,* on which respondent so heavily relies, the employer did not implement only a portion of its wage proposal. The employer implemented the entire wage proposal offer it had proposed during negotiations—a combination of fixed rates and merit raises. *Id.* n. 37. In contrast, in the present case, the Company implemented only a portion of the final wage offer it had proposed—a higher fixed hourly wage rate in lieu of incentive pay and gain sharing. Although the Board in *Presto Casting* indicated that the wage portion, without the benefit portion, of a final offer may lawfully be unilaterally implemented, it did not hold, as respondent implies, that only a portion of the wage component of a final pre-impasse offer may be lawfully unilaterally implemented.

We find that *Emhart* differs significantly from the present case in other respects as well. The Company contends that the strike settlement plan in *Emhart* is no different than the health insurance plan in the present case, and that the elements of the health plan

proposed in its final offer of April 21, 1989 were separate, unrelated components, just as the elements of the strike settlement agreement in *Emhart* were. We disagree. Even though *Emhart* did not involve the negotiation of a collective bargaining agreement, we believe that conceptually it is more appropriate to compare the strike settlement agreement in *Emhart* to a collective bargaining agreement, which is an overall whole made up of separate component parts—a wage plan, a health plan, a pension plan, other benefit plans, which are usually presented as discrete, comprehensive, integrated entities. The court in *Emhart* found that implementation of only a portion of the strike settlement agreement was similar to cases in which "an employer lawfully implemented the wage portions, but not the benefits portions, of its final pre-impasse offer." 907 F.2d at 377. Thus, it is clear that the Second Circuit in *Emhart* was comparing the strike settlement agreement to a collective bargaining agreement, not to a separate, discrete component of a collective bargaining agreement such as a health insurance plan. We interpret the court's holding in *Emhart* to mean that just as an employer is free to implement the wage portion, but not the benefit portion, of a CBA, Emhart was free to implement the reinstatement by plant-wide seniority portion, which was the central component of the strike settlement agreement (comparable to the wage portion, which often is the central component, of a CBA), but not the "recall selection form," which the court found was peripheral and of little significance to the overall agreement (similar to a peripheral benefit in a CBA).

The holding of *Emhart* is thus not, as respondent Plainville contends, that an employer is free to implement anything discussed separately pre-impasse that is explicitly stated in the final offer, but that once an employer bargains in good faith to impasse, its duty to bargain further is suspended, and it is free to impose all, or part, of its pre-impasse final proposal, provided that the partial implementation was *reasonably comprehended* within the final offer to the Union. The Second Circuit in *Emhart* did not hold that the unilateral implementation regarding reinstatement by plant-wide seniority was

proper without implementing the entire final proposal merely because it was "an explicit part" of the final proposal. The court, instead, found that plant-wide seniority was the most significant part of the final proposal, that the omission of the recall selection form (the significance of which was ambiguous) was minor, that the reinstatement by plant-wide seniority was within the spirit of the negotiations as it met with the basic request of the Union, and that the implementation did not differ significantly from the final offer. In contrast, in the present case, the implementation of only the negative portions of the health plan did differ significantly from what was proposed and did not meet with the basic request of the Union, who wanted the lower premium payments under the Teamster plan. Moreover, it cannot be said that the omission of the beneficial portions of the health plan were minor omissions or that this was in the spirit of the negotiations. The Company was trying to get the Union to accept the self-insured health plan instead of insisting on the Teamster plan, which had lower employee premium payments, by sweetening the self-insured plan with increased benefits. Moreover, the *Emhart* court found that the record failed to provide substantial evidence that other portions of the strike settlement plan, such as the recall selection form (which the Union insisted had been an integral part of the final agreement), had been discussed, except in passing, or were of major concern at all. In contrast, in the present case, the record indicates that the beneficial components of the health plan had been discussed during negotiations and were of concern to the Union. Thus, factually the present case is clearly distinguishable from *Emhart*.

The issue in the present case is whether in its final pre-impasse proposal in regard to the health plan, it was "reasonably comprehended" that the Company would implement the portions of the health plan that were disadvantageous to the Union, but would not implement the advantageous portions. Although the ALJ found that the Company did not explicitly say that the health plan was being offered on a "take it or leave it" basis,

the ALJ found that this may have been a reasonable conclusion by the Union.

We believe that the only logical conclusion was that the health plan was presented as a comprehensive, integrated component of the collective bargaining agreement. The memo to Union members which the Company sent on April 24, 1989 to clarify its final offer of April 21, 1989 stated that in response to the Union's concern for a better health plan, it proposed improvements to the health plan including a prescription drug card with a $2 to $4 deductible for each prescription. The Company then listed the additional costs and plan limitations, but nowhere indicated that it intended to implement only those portions of the health plan detrimental to employees without also implementing the advantageous portions, which were of concern to the Union. Although an employer is not required to implement its entire final offer, we believe it may lawfully implement only the negative portions of a self contained component of a collective bargaining agreement (such as a health or benefit plan) only if the employees reasonably comprehend that only the negative provisions are going to be implemented. After reviewing the record as a whole in regard to the health plan, we believe that even though the elements of the health plan in the Company's final offer were individually identifiable, the plan was presented as a health insurance plan whose elements bore an economic and functional relationship to each other. In other words, it was "reasonably comprehended" by the Union that if costs and limitations were to be increased over the existing plan, the Union would also receive the additional benefits proposed. Although the Company may have been willing to negotiate changes (i.e., eliminate some benefits for lower premiums and deductibles), there was never any indication that only the negative portions of the health plan would be adopted. During the meeting of April 21, 1989, the discussion about the health plan consisted of the ten items of the plan being read by the parties and compared in cost to the Teamster plan. Although some of the Union's objections to the disadvantageous items were discussed, there is no evidence that the Company indicated that it planned to implement only those items with-out also implementing the additional benefits. Also Lawrence, the Company negotiator, testified that the Company was "proposing to make improvements in its self-insured program administered by Brunswick as a substitution for ... the Teamster plan," indicating that the Company health plan was presented as a comprehensive, integrated alternative to the Teamster plan.

Unlike the separate elements of the strike settlement agreement in *Emhart*, which the Second Circuit found could unilaterally stand on their own, we find that in the present case, the elements of the health plan were interrelated. In the present case, the health plan at issue was a discrete, self-contained component of a collective bargaining agreement, which was discussed with no indication that only the negative portions would be implemented. An employer cannot splinter off or fragment proposals presented as a comprehensive system in such a way that the portions implemented are not reasonably comprehended as unrelated in the employer's previous offers. Otherwise, the character of the implemented plan takes on a different meaning (increased costs) from that offered to the Union (increased costs and benefits). *See GHR Energy Corp.*, 294 NLRB 1011, 1015–16 (1989) (unlawful unilateral action where employer implemented polygraph testing without allowing a third party to accompany employees in the testing room, contrary to previous offers), *enforced*, 924 F.2d 1055 (5th Cir.1991). We believe this is what occurred in the present case. Logically what was "reasonably comprehended" by the Union was that after impasse was reached, the Company would either keep the existing health plan or adopt the final proposal in regard to the health plan it had presented to the Union on April 21, 1989. If an employer is free to implement any portion of a health plan discussed separately without indicating its intention of doing so, the idea of meaningful negotiations for a comprehensive health or other benefit component of a collective bargaining agreement would be eviscerated. Nowhere in the record is there any indication that the Company manifested its intent to the Union to implement only the disadvantageous elements of the health plan, whose

positive and negative components logically bear an economic and functional relationship to each other. Therefore, we find that the implementation of only the negative portions of the health plan was significantly different from the Company's final pre-impasse offer of April 21, 1989 and was an unlawful unilateral implementation.

Because the Company unilaterally implemented a health plan not "reasonably comprehended" within its pre-impasse offers, the Company violated § 8(a)(5) of the NLRA. The Board's conclusion in its order that the Company must return to its pre-impasse health plan is hereby affirmed.

## IV.

Finally, we address the issues raised by the dissent. As discussed on pp. 1325–26 of the opinion, the right that was violated in the present case was "the obligation of the employer and representative of its employees to bargain with each other in good faith," which is undercut if the employer makes unilateral changes that are not "reasonably comprehended" within its pre-impasse proposals to the union. The dissent states that we erroneously focus on the final pre-impasse proposal of April 21, 1989, and do not treat the pre-impasse proposals as a group. This is not so. The final offer was the culmination of a complicated and lengthy bargaining process, which we analyzed in its entirety on pp. 1327–29 of the opinion. After bargaining to impasse the first time on February 10, 1988, Plainville made lawful unilateral changes in regard to wage and health benefits on March 7, 1988 based on its pre-February 10, 1988 offers. Although an analysis of the pre-February 10, 1988 offers is necessary to understand the background of this case, the lawful unilateral changes based on the proposals contained in the pre-February 10, 1988 offers had already been implemented by Plainville on March 7, 1988. Therefore, the relevant pre-impasse proposals to be treated as a group in regard to the May 1, 1989 implementation at issue in the present case consisted of the offers made after the prior

implementation of March 7, 1988. The parties met twice again in 1988 in which additional changes to the health plan were discussed and the proposals were rejected. The April 21, 1989 offer was the *only* offer after the March 7, 1988 implementation in which a change in wages was proposed. Therefore, we focus on the April 21, 1989 offer not necessarily because it is the final offer, but because of the peculiar facts of this case in which the parties twice bargained to impasse and a prior unilateral implementation already had occurred.

We believe that the dissent interprets our opinion much too broadly. Nowhere is it stated that after bargaining to impasse, an employer may only implement its best offer or must implement its entire offer.[12] Instead, our detailed review of the bargaining process indicates that the unilateral changes that occurred on May 1, 1989 in the present case were significantly different from any proposed during bargaining. We believe this is a very fact-specific case and based on the facts, the implementations made were not "reasonably comprehended" within Plainville's pre-impasse proposals. Our opinion is based on our factual determination that the Company's retention on May 1, 1989 of the $9.50 fixed hourly wage rate and concomitant elimination of the gain sharing and incentive pay plans and changes in health benefits were an overall reduction in wages and health benefits that had never been presented to the Union in its prior offers.

The dissent does not dispute our factual findings, but alleges that the majority is trying to rewrite labor law and create a new legal standard. To the contrary, we have attempted in our role as an appellate court to review the factual findings of the Board under a substantial evidence standard and have concluded that there is substantial evidence in the record to support the Board's factual determination that before bargaining to impasse on April 21, 1989, the Company consistently treated the proposed increase in the fixed hourly wage rate as *quid pro quo* for the elimination of the gain sharing and incen-

---

12. On page 1333 of the opinion, we explicitly differentiate this case from the line of cases which uphold the implementation of part, but not all, of a pre-impasse offer, cases with which we fully agree.

tive pay plans, and that the overall reduction in wages that occurred when the gain sharing and incentive pay plans were eliminated was a unilateral action not "reasonably comprehended" in Plainville's pre-impasse proposals. A similar factual determination was made in regard to health benefits. The dissent is correct in indicating that the Company had the legal right to reduce the employee's wages and health benefits as an economic weapon, but *only* if the Company gave the Union notice of its intentions and an opportunity to respond, which it did not do. It is the right to notice and an opportunity to bargain about proposed changes that was violated in the present case. We make no attempt to balance the relative bargaining power of the parties, but simply seek to enforce § 8(a)(5) of the Act.

We reject the dissent's allegation that we are adopting an orphan standard. The dissent first alleges that the majority is adding a subjective gloss to the "reasonably comprehended" standard. We emphatically have not done this and have not implied that the Union is to be the "arbiter" of what is "reasonably comprehended," but instead after carefully reviewing the record, have concluded that there is substantial evidence to support the ALJ's determination that by an *objective* standard, the Union reasonably comprehended that the Company was not proposing the overall reduction in wages and changes in health benefits that occurred.[13] The Company's April 24, 1989 letter to the Union explaining the April 21, 1989 offer is one example of the objective evidence which supports this conclusion, evidence which the dissent does not consider.

We are aware that the "reasonably comprehended" standard does not require that a pre-impasse offer must be implemented in its entirety, nor do we wish to add such a component to this standard. Based on the facts of this particular case, we have found that an employer, who consistently presents a portion of a single, general mandatory subject of bargaining as interrelated, in the sense that

the inclusion of one item is presented as *quid pro quo* for the elimination of another item, may not fragment the *quid pro quo* during implementation by arguing that both items were "included" in its offer. This holding does not restrict an employer to the status quo or to the best pre-impasse offer. Nor do we mandate that an employer unilaterally implement no fewer than all final proposals pertaining to a single, general mandatory subject of bargaining. We only require that an employer apprise union employees of its intentions in its pre-impasse offers and find that the employer in the present case failed to do so. The reduction in wages and change in health benefits are not unlawful unilateral changes because they are less favorable or because they are only part of the final proposal, but because they are significantly different than what Plainville presented to the Union in its pre-impasse offers. We do not believe venerable Supreme Court precedent is threatened by such a holding.

## V.

To conclude, the enforcement of the Board's order is hereby GRANTED. The Company violated section 8(a)(5) of the Act, because following a lawful impasse, it implemented wage and health plans not "reasonably comprehended" in its pre-impasse offers. The Board's order that the Company return to its pre-impasse wage and health plans is hereby AFFIRMED.

BATCHELDER, Circuit Judge, dissenting.

The court today affirms the decision of the National Labor Relations Board (Board or NLRB) and holds unlawful an employer's recourse to post-impasse, unilateral changes that are reasonably comprehended within, yet less favorable than, the employer's pre-impasse proposals. Neither the Board's nor the majority's opinion is premised on independent evidence of the employer's subjective bad faith. Rather, the opinions presum-

---

**13.** The Union and Plainville disagreed about what was "reasonably comprehended." The ALJ, after a hearing in which it made credibility determinations, concluded that by an objective standard, the changes made were not "reason-

ably comprehended" in the pre-impasse proposals. This conclusion does not make the Union the final arbiter of what is "reasonably comprehended."

ably rest on the determination that a unilateral change of the kind implemented by the employer circumvents and thus inherently violates the employer's duty "to bargain collectively" found in § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). *See NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (explaining the duty "to bargain collectively").

Indeed, "the Board need not inquire into employer motivation to support a finding of an unfair labor practice where the employer conduct is demonstrably destructive of employee rights and is not justified by the service of significant or important business ends." *NLRB v. Brown,* 380 U.S. 278, 282, 85 S.Ct. 980, 983, 13 L.Ed.2d 839 (1965). However, nowhere does the Board or the majority identify the employee rights destroyed by the employer's unilateral changes. Nowhere does the Board or the majority explore the legitimate ends the employer's unilateral changes may serve. Instead, the majority applies legal standards that are irreconcilable with labor policy and precedent and approves the Board's foray into matters beyond its authority. In its wake, the majority leaves serious disincentives to good-faith collective bargaining. For these reasons, explained more fully below, I respectfully dissent.

## I.

It is undisputed that the controlling standard for assessing the lawfulness of an employer's post-impasse, unilateral changes in terms and conditions of employment is whether the changes were "reasonably comprehended within [the employer's] pre-impasse proposals." This language first ap-

peared in an NLRB decision, *Taft Broadcasting Co.,* 163 N.L.R.B. 475, 478 (1967), *aff'd sub nom., American Fed'n of Television and Radio Artists v. NLRB,* 395 F.2d 622 (D.C.Cir.1968),[1] and has been adopted by the Sixth Circuit, *see, e.g., United Paperworkers Int'l Union v. NLRB,* 981 F.2d 861, 866 (6th Cir.1992).

The majority initially sets forth the *Taft* standard as the applicable one: "After the parties have bargained to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are 'reasonably comprehended within his pre-impasse proposals....'" *See* Op. at 1326 (quoting *United Paperworkers,* 981 F.2d at 866). However, as the majority's opinion progresses, the *Taft* standard undergoes an unexplained and unjustifiable, three-tiered metamorphosis.

First, the majority limits lawful changes to those consistent with the employer's *final* pre-impasse proposal, not the employer's pre-impasse proposals as a group.[2] In narrowing the relevant comparison as it does, the majority confines the employer to either perpetuating the terms of an expired and thus unenforceable collective bargaining agreement (that is, the status quo) or implementing unilaterally his last (in other words, best to date) pre-impasse proposal. *See* Op. at 1333 n. 10, 1338. The majority does not, and cannot, point to authority for this dramatic transformation of the applicable standard. It is beyond contention that the relevant comparison is between the unilateral change and the pre-impasse proposals as a group, not the final pre-impasse offer alone.

**1.** The D.C. Circuit explicitly approved the Board's embodiment of the applicable doctrine. *See American Fed'n,* 395 F.2d at 624. Importantly, in the context of pre-impasse, unilateral changes, the United States Supreme Court has endorsed a standard complementary in substance to that of the *Taft* Board: "Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy." *See NLRB v. Katz,* 369 U.S. 736, 747, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962); *see also NLRB v. Crompton–Highland Mills, Inc.,* 337 U.S. 217, 225, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949).

**2.** For example, the majority frames the first question presented as follows: "We must first decide whether substantial evidence supports the Board's finding that the Company violated § 8(a)(5) of the NLRA on May 1, 1989 by implementing a post-impasse wage plan inconsistent with its *final pre-impasse wage proposal* to the Union." *See* Op. at 1325 (emphasis added). This limitation is echoed throughout the opinion, including the majority's statement of the second question presented. *See* Op. at 1337.

See, e.g., *NLRB v. Crompton–Highland Mills, Inc.*, 337 U.S. 217, 225, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949) (holding unlawful unilateral changes significantly different from "any which the employer has proposed" during bargaining); *Emhart Indus. v. NLRB*, 907 F.2d 372, 376 (2d Cir.1990) ("The employer need not implement all of its pre-impasse proposals, but the changes must be 'in line with or . . . no more favorable than' those offered prior to impasse.") (quoting *Bi–Rite Foods, Inc.*, 147 N.L.R.B. 59 (1964)).

Second, the majority truncates the standard to read only "reasonably comprehended" and then adds its own ending, "by the union," in place of "within his pre-impasse offers." [3] By focusing on what the union "comprehended," the majority places a subjective gloss on the *Taft* standard's purely objective evaluation of the employer's pre-impasse offers and makes the union the arbiter of its own charges of unlawful, post-impasse, unilateral changes. However, it is apparent from its plain language that the *Taft* standard uses "comprehended" in the sense of "included," not in the sense of "understood." Thus, the union's perceptions are irrelevant to the inquiry under *Taft*. The proper inquiry considers whether the unilateral changes were included within, or part of, pre-impasse offers.

Third, the majority introduces a new component to the standard, without even discussing its origin, much less its merits. This component is the requirement that the employer implement nothing less than the entire proposal, if that proposal is (reasonably comprehended by the union as) a "comprehensive, integrated whole." This component first appears, like a little orphan, on page 1326 of the opinion, and, by virtue of repetition, the majority soon adopts this orphan as a regular member of the majority's legal standard family.

Within the context of this case, the "comprehensive, integrated whole" language arose when, in 1990, the parties to this case stipu-

lated the facts and submitted the charge to the NLRB for adjudication without a hearing. In 1991, the Board remanded the case, with the following directions, for a hearing before an administrative law judge (ALJ):

> [T]he Board finds that further evidence reflecting [the company's] contemporaneous objective manifestations of intent in making its proposals for employee compensation and medical insurance coverage is necessary to determine whether the proposals on each bargaining subject were put forth as separate items or as a comprehensive, integrated whole.

The ALJ understood this to establish a refinement of the *Taft* standard:

> If the latter, then a fragmented implementation would be inconsistent with [the company's] prior offers to the Union, thus not affording an opportunity to bargain on the changes. If the former, then the implementation would be "reasonably comprehended" within the pre-impasse proposals.

The ALJ applied this standard without an examination of its underlying policies. In due course, the ALJ's opinion became the opinion of the Board.

In embracing the NLRB's interpretation of the *Taft* standard, the majority further narrows the employer's choices of unilateral, post-impasse changes. Not only is the employer restricted to the status quo or the best pre-impasse offer, the employer cannot implement portions of that best offer if the change would fragment a comprehensive, integrated whole. At bottom, the majority mandates that an employer unilaterally implement no fewer than all final proposals pertaining to a single, general mandatory subject of bargaining, such as wages or medical insurance. *See* Op. at 1336–37. As with the first and second alterations of *Taft*, the majority makes no attempt to explain its departure from the established standard. Certainly, nothing in Supreme Court precedent requires adoption of this orphan standard. *See, e.g., Emhart Indus. v. NLRB*,

---

3. For example, the majority concludes its analysis of the unilateral wage change by stating, "[T]he Company made a unilateral implementation that was not 'reasonably comprehended' *by the Union*. The Board correctly concluded that

the unilateral implementation was unlawful. . . ." *See* Op. at 1333 (emphasis added). This alteration, too, appears prominently throughout the opinion.

907 F.2d at 380 (denying enforcement of Board order because partial implementation of pre-impasse offer not found to be unfair labor practice).

The majority disclaims the effect of the "comprehensive, integrated whole" standard, reasoning that an employer may preserve his options for post-impasse, unilateral changes by presenting portions of his wage proposals separately. *See* Op. at 1334 n. 11. What does this "separateness" look like? Does it require a meeting on Tuesday to negotiate hourly rates and a meeting on Wednesday to negotiate the commission or profit-sharing plan?

As should be apparent under the majority's view of proper negotiation, an employer cannot preserve his option to implement less favorable changes without engaging in calculated maneuvering that would inhibit the negotiation process. Further, these maneuvers would likely fail, for the relevant inquiry under the majority's standard is whether the *union* reasonably comprehends the portions as separate. I venture to say that, despite the employer's efforts to present portions of, for example, a wage proposal separately, no union will "reasonably comprehend" them as such. Importantly, then, the majority's decision undermines incentives for both parties to approach the bargaining table with a desire to reach an agreement and encourages the "take it or leave it" attitude that motivated Congress to enact the NLRA. *See NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 487–88, 80 S.Ct. 419, 426–27, 4 L.Ed.2d 454 (1960).

In sum, the import of the Board standard, particularly in light of the majority's tangled application of it, is that an employer cannot, after negotiating in good faith to impasse, unilaterally implement changes that are part of, but less favorable than, the employer's pre-impasse proposals with respect to any single, general mandatory subject of bargaining, because to do so would necessarily fragment a comprehensive, integrated whole. I acknowledge that the Board and majority opinions do not explicitly state a per se prohibition on this species of unilateral change. However, as Little Red Riding Hood would testify were she here, a wolf in Grandma's clothing is a wolf nonetheless. And the wolf lurking in the majority's opinion threatens both the NLRA and venerable Supreme Court precedent.

II.

Both the Board and the majority fail to justify the elimination of this breed of unilateral change. This failure contravenes the NLRA and Supreme Court precedent by permitting the Board to determine national labor policy, which is the exclusive province of Congress.

The NLRA clearly contemplates a system in which the requirement of good-faith bargaining and the use of economic pressure to persuade the other party to concede interact cooperatively to facilitate agreement between the employer and the union. *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 317, 85 S.Ct. 955, 966–67, 13 L.Ed.2d 855 (1965); *Insurance Agents',* 361 U.S. at 489, 80 S.Ct. at 427. Because the availability of economic weapons to both parties is an integral component of the NLRA's scheme, the Board's authority to restrict the use of such weapons is circumscribed. The Supreme Court's opinion in *NLRB v. Brown,* 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), contains the classic statement: "[T]he [NLRA] does not constitute the Board as an 'arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands.'" *Id.* at 283, 85 S.Ct. at 984 (quoting *Insurance Agents',* 361 U.S. at 497, 80 S.Ct. at 431).

The Board possesses authority only to identify and then balance the legitimate interests of the parties; legitimate interests are those grounded firmly in the rights and restrictions specified in the NLRA. *American Ship Bldg.,* 380 U.S. at 316, 85 S.Ct. at 966; *NLRB v. Truck Drivers Local Union No. 449 (Buffalo Linen),* 353 U.S. 87, 96, 77 S.Ct. 643, 647–48, 1 L.Ed.2d 676 (1957); *see also NLRB v. Katz,* 369 U.S. 736, 747, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962). Under no circumstances may the Board "assess the relative economic power of the adversaries in the bargaining process and ... deny weapons to one party or the other

because of its assessment of that party's bargaining power." *American Ship Bldg.*, 380 U.S. at 317, 85 S.Ct. at 966–67; *see also Insurance Agents'*, 361 U.S. at 490, 80 S.Ct. at 427–28. The danger in allowing the Board latitude to balance the relative power of the parties, as opposed to their legitimate interests, is apparent: "[I]f the Board could regulate the choice of economic weapons that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract." *Insurance Agents'*, 361 U.S. at 490, 80 S.Ct. at 427. This would usurp Congress's role in making national labor policy. *Id.* at 499–500, 80 S.Ct. at 432–33.

Labor policy, then, favors the availability of economic weapons, one such weapon being the employer's right to implement changes unilaterally after reaching impasse through good-faith negotiations. *American Ship Bldg.*, 380 U.S. at 316, 85 S.Ct. at 966; *American Fed'n of Television and Radio Artists v. NLRB*, 395 F.2d 622, 624 (D.C.Cir.1968), *aff'g, Taft Broadcasting Co.*, 163 N.L.R.B. 475 (1967). Where the parties have bargained in good faith to impasse, a court may strike down a unilateral change only if that change is inherently destructive of the collective bargaining process as framed by the NLRA. *See Katz*, 369 U.S. at 747, 82 S.Ct. at 1113–14; *see also Brown*, 380 U.S. at 282, 85 S.Ct. at 983; *Insurance Agents'*, 361 U.S. at 490, 80 S.Ct. at 427–28.

The Board's opinion contains no explanation of its conclusion that this employer's unilateral change necessarily infringes on a right or restriction set by the NLRA. In the majority's opinion, there is only one sentence that could possibly be construed as an explanation. At the end of its analysis, the majority opines that to permit implementation of a portion of a proposal with respect to a single, general bargaining subject would eviscerate the idea of meaningful negotiations. *See* Op. at 1338. The implication is that to allow unilateral, post-impasse changes that are less favorable than, though part of, pre-impasse proposals would grant the employer "too much power" in the collective bargaining pro-

cess. *See American Ship Bldg.*, 380 U.S. at 317, 85 S.Ct. at 966–67.

I concede that, if permitted, the employer's unilateral changes would likely cause hardship for at least some members of the union. This fact alone, however, does not make the changes objectionable under the NLRA. *See Insurance Agents'*, 361 U.S. at 490, 80 S.Ct. at 427–28. Accordingly, the Board exceeded its authority in balancing the relative bargaining power of the parties. I would therefore deny enforcement of the award, as it is based on an erroneous legal foundation.

### III.

The majority found the employer's unilateral changes unlawful. That a flawed analysis led to the majority's result does not necessarily impugn the outcome. However, I think the outcome of this case may indeed also be flawed, in light of the policy behind *Taft*'s "reasonably comprehended" standard.

As discussed, the majority's standard affirmatively impairs good-faith bargaining, which is the core of the NLRA. *Insurance Agents'*, 361 U.S. at 485, 487–88, 80 S.Ct. at 425, 426–27. One might argue this sacrifice is worthwhile in light of the evil of which we are now rid. I doubt that argument carries the day, for I cannot find any harm in the economic weapon used by this employer. A unilateral change that is *more* favorable than an employer's proposals undoubtedly circumvents and inherently violates the duty to negotiate: It ousts any possibility that the terms of the change, if presented to the union, would have facilitated settlement, and it weakens union representation by freely giving union members a better deal than their representative was able to secure. *Id.* at 485, 80 S.Ct. at 425 (citing *NLRB v. Crompton–Highland Mills, Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949)); *see also May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385–86, 66 S.Ct. 203, 209, 90 L.Ed. 145 (1945); *American Fed'n*, 395 F.2d at 629–30 (applying *Taft* ).

A unilateral change that is *less* favorable raises, on its face, neither of those problems. Indeed, I suspect the change operates in the traditional manner of economic pressure

against a union: With conditions worsening for union members, the members urge their representative to return to the table and bargain diligently, but successfully, for better terms than those imposed unilaterally. Alternatively, the union elects to impose its own form of economic pressure on the employer, perhaps through a strike or a concerted refusal to abide certain objectionable terms.

What may be an effective and perfectly lawful tool of economic pressure is in danger of extinction, and yet a thorough legal analysis that reflects the import of this situation has not been conducted. The fairest resolution of this case, in the absence of the requisite legal analysis, is to remand so that the Board may engage in such an analysis. *Northport Health Servs., Inc. v. NLRB*, 961 F.2d 1547, 1553 (11th Cir.1992). This "insistence on well-articulated reasoning in Board opinions is only secondarily designed to accommodate the needs of courts seeking to discern irrationality. 'Its primary purpose is to impose a discipline upon the agency itself, assuring that it has undergone a process of reasoned decision-making rather than haphazardly reached a result that could (on one or another basis of analysis) be sustained.'" *United Food and Commercial Workers v. NLRB*, 880 F.2d 1422, 1439 (D.C. Cir.1989) (quoting *International Ass'n of Bridge, Structural and Ornamental Iron Workers v. NLRB*, 792 F.2d 241, 247 (D.C.Cir.1986)).

I would remand the case to the Board for reconsideration and a detailed opinion in light of the concerns expressed above. Therefore, I dissent.